BOSWELL *v.* GILLETT.

5-940                                    295 S. W. 2d 758

Opinion delivered November 12, 1956.

[Rehearing denied December 17, 1956.]

*Williams & Gardner* and *J. M. Smallwood,* for appellant.

*Robert J. White,* for appellee.

ED. F. McFADDIN, Associate Justice. Each of the three litigants was dissatisfied with the Chancery decree, so we have both direct appeals and cross-appeals; and for easy identification we will refer to the parties by name rather than by legal designation.

For some time prior to 1946 Mrs. Mattie Boswell owned a building in Russellville in which the Malco Theatres, Inc. operated a picture show. Mrs. Boswell was an elderly lady and depended on her son, Cledys Boswell, for advice in business matters. E. R. Gillett, of Memphis, Tennessee, was the owner of a number of picture shows, and he desired to dispossess Malco Theatres, Inc. and operate a picture show under his own control in the said Boswell building.

On January 7, 1946, E. R. Gillett, as first party, and Cledys Boswell, as second party, entered into a memorandum agreement (approved and signed by Mrs. Mattie Boswell), which provided, *inter alia*: (a) that proceedings would be prosecuted to evict Malco Theatres, Inc., from Mrs. Boswell's building, and all expenses of such litigation would be paid by Gillett; (b) that when possession of the building had been obtained, Gillett and Cledys Boswell would then rent the building from Mrs. Boswell at $150 per month and Gillett and Cledys Boswell would operate a picture show in the building with Cledys Boswell as manager at a salary of $50 per week; (c) that E. R. Gillett would furnish all money for

equipping and furnishing the picture show and would provide funds for the said Gillett-Boswell enterprise.[1]

The Malco Theatres, Inc. was finally ousted from the Boswell Building (see *Malco Theatres, Inc.* v. *Boswell,* 211 Ark. 143, 199 S. W. 2d 606); and in May, 1947 Mrs. Mattie Boswell executed a contract to E. R. Gillett and Cledys Boswell, which, *inter alia,* leased them the building for five years at a rental of $150 per month. Also in May, 1947, E. R. Gillett and Cledys Boswell entered into a "partnership agreement" for the operation of the picture show in the Boswell building, which partnership agreement incorporated in it the memorandum agreement between the parties, as previously mentioned.

The Gillett-Boswell enterprise named its theater the "Main Theater" and began operations in May, 1947, and continued operations until December 27, 1948, when a fire in the projection room damaged the projection equipment and screen and also caused slight damage to the building. Being unable to contact Gillett by phone to tell him of the fire, Cledys Boswell wrote Gillett a letter under date of December 28, 1948, informing him of the fire and asking instructions. Receiving no reply from that letter, Cledys Boswell wrote Gillett another letter under date of March 4, 1949, again asking instructions. No reply was made by Gillett to either letter because there had been a "falling out" between Gillett and Boswell in July, 1948, as will be mentioned later. Gillett continued to pay Mrs. Boswell her rent at $150 per month from January, 1949 until April 30, 1952, which

---

[1] This is the salient language of the contract: ". . . (e) The party of the first part (Gillett) contemplates the investment of and installation of sufficient equipment in said building to operate a first class picture show at his own expense; for that purpose he agrees when possession of said building is obtained, to deposit such funds as may be necessary to equip and operate said picture show, and such deposit shall be in a joint account, and all funds derived from the operation of said picture show business shall be deposited by the party of the second part (Cledys Boswell) in such joint account. (f) After said picture business is in operation, and a surplus is accumulated from its operation and deposited in said joint fund, the party of the first part shall have the right to withdraw from said surplus, as his needs may require, and at such times as he may desire, the funds advanced by him until he has been entirely repaid for all funds advanced by him; provided, however, that at no time shall the surplus funds be reduced below $1000.00 for necessary operating expenses."

was the end of the five-year lease term. The equipment of the Main Theater continued in Mrs. Boswell's building until April 28, 1955, but she received no rent for the building after April 30, 1952.

The Main Theater never resumed operations after the fire of December, 1948; and on August 3, 1950, Gillett filed the present suit against Mrs. Mattie Boswell and Cledys Boswell, alleging, *inter alia*: (a) that the failure of the picture show to operate after the fire was due to Cledys Boswell; and that Mrs. Mattie Boswell's lease on the picture show should be extended from the date of the final decision in this case for a period of time equal to the time from the fire to the final decision and should be held to be assignable. As against Cledys Boswell, Gillett also prayed that the Gillett-Boswell partnership be dissolved, that the lease and all equipment be sold and an accounting made, and that Cledys Boswell be liable for one-half of the losses of the partnership. Mrs. Boswell, by answer and cross-complaint, sought rent at $150 per month for all the months from May 1, 1952. Cledys Boswell, by answer and cross-complaint, denied any liability for any loss suffered by Gillett and sought judgment for salary as manager at $50 a week from December, 1948 (the date of the fire) until final adjudication of the case. For a variety of reasons best known to the litigants, the case dragged in court for several years and it was not until August 11, 1955, that a decree was entered in the Chancery Court. As aforesaid, all parties have appealed; and we now discuss the main phases of the case.

I. *The Controversy Between Mrs. Mattie Boswell And Gillett.* By amendment filed in January, 1951, Gillett alleged that Mrs. Boswell had refused to agree to any assignment of the lease contract because she was under the influence of her son, Cledys Boswell. By amendment filed in October, 1952, Gillett said that he had been ". . . required to pay under said lease the monthly rentals to and including the date of expiration thereof . . . "; and prayed ". . . judgment be entered in favor of the plaintiff as the equities therein shall determine."

The Chancery Court found that Gillett had paid Mrs. Boswell the rent of $150 per month from January 1, 1949 to April 30, 1952 (the expiration of the five-year term); that the building had not been repaired; that in its damaged condition the building was worth only $100 per month for such time; and that Gillett should, therefore, recover $50 per month from Mrs. Boswell for the forty months from January, 1949 through April, 1952, during which time he had paid her rent at $150 a month. Accordingly, the Chancery Court rendered judgment against Mrs. Boswell in favor of Gillett for $2,000. Mrs. Boswell has appealed on that item and also on the failure of the Court to award her judgment against Gillett for rent from May 1, 1952 (the end of the five-year contract period), until April 28, 1955, when the building was vacated by removal of the picture show equipment. Gillett has cross-appealed because the Court only allowed him a return of $50 per month instead of $75 per month for the forty months that he paid the rent, his theory being that Mrs. Boswell knew that he was a partner with Cledys Boswell, and, as such partner, he should only pay half of the rent. It is Gillett's contention that, because of the relationship between Mrs. Boswell and her son, Cledys Boswell, she was at all times in the same situation as Cledys Boswell and liable for failure to allow the lease to be assigned.

We find no merit in any of Gillett's claims against Mrs. Mattie Boswell. The record reflects that he knew of the close relationship between Mrs. Boswell and her son and used that relationship as a leverage to dispossess Malco Theatres, Inc. from the building: he promised Cledys Boswell a salary of $50.00 per week so that Cledys Boswell would persuade his mother to dispossess Malco and to rent the building to the Gillett-Boswell enterprise. There was no obligation on the part of Mrs. Boswell to permit the Gillett and Cledys Boswell enterprise to as-

sign the lease.[2]   Gillett recognized her right to refuse assignment, and month by month sent her his personal checks to pay the rent; so he cannot claim that she denied him any of his contract rights.

There are several reasons why the Trial Court was in error in holding that Mrs. Boswell should return to Gillett any of the money that he had paid her for the rent from January 1, 1949 to April 30, 1952: but one reason is sufficient to state.   Gillett had *voluntarily* paid Mrs. Boswell the rent during all of these forty months. He testified: ''Q. What was your intention after you got this report of the condition of the building? A. I had no intention of doing anything but to pay this $150 a month.''   Elsewhere, he said that with the theatre not running he was losing only $150 per month (i. e., the rent), whereas, if the theatre had been operating, he would have lost $1,000 a month.   Thus, Gillett voluntarily paid Mrs. Boswell the rent each month; and one who voluntarily makes payments without mistake of fact ór fraud, duress, coercion or extortion, cannot recover them. *Ritchie* v. *Bluff City Lbr. Co.,* 86 Ark. 175, 110 S. W. 591; *North Cross* v. *Miller,* 184 Ark. 463, 43 S. W. 2d 734.   See Annotation in 53 A. L. R. 949 on the subject: ''Right to Recover Money Voluntarily Paid  . . .'' etc.

Gillett claims that Mrs. Boswell did not repair the theatre building after the fire and, therefore, that she should not be allowed to collect the full rent.   But Gillett knew of the damage when he was paying the rent each month and he made no claim that the building should be repaired.   Furthermore, the damage to the building was slight.   Gillett could have had the repairs made if he so desired and could have claimed the expense of such repairs against Mrs. Boswell.   Such would have been his measure of damages.   See *Young* v. *Berman,* 96

---

[2] The lease contract of 1947 — in which Mrs. Boswell was first party and Cledys Boswell and Gillett were second parties — contained this language: "It is further agreed and understood by and between the parties hereto that the parties of the second part, nor either of them, their administrators, successors or assigns, may assign or sublease the premises herein or any part thereof, during the term herein specified or any extension thereof, unless such assignment or subleasing is agreed to by the party of the first part, her administrators, successors or assigns, in writing endorsed hereon."

Ark. 78, 131 S. W. 62; *Johnson* v. *Inman,* 134 Ark. 345, 203 S. W. 836; and *Dugan* v. *Browne,* 187 Ark. 12, 58 S. W. 2d 426. Gillett never claimed any forfeiture of the lease because of Mrs. Boswell's failure to repair. Since he voluntarily paid the rent each month, he should not be allowed to recover any part of such payments.

From May 1, 1952 until the building was vacated on April 28, 1955, the Trial Court refused to allow Mrs. Boswell any recovery for rent against Gillett. Instead, the Trial Court gave her judgment against Cledys Boswell only. We hold that Mrs. Boswell was entitled to judgment against Gillett individually for $75 per month — one-half of the rental value — for such period of time; and was also entitled to judgment against Cledys Boswell individually for $75 per month — the other half of the rental value — for such period of time.

So, as between Mrs. Mattie Boswell's estate[3] and Gillett, we reverse and set aside the $2,000 judgment that the Trial Court awarded Gillett against her; and we remand the case to the Chancery Court with directions to enter judgment for Mrs. Boswell's estate against Gillett individually for $2,700, being calculated at $75 per month from May 1, 1952 until April 28, 1955; and also with directions to render judgment in favor of Mrs. Boswell's estate against Cledys Boswell for a like sum of $2,700, being the other half of the rent from May 1, 1952 until April 28, 1955. The estate of Mrs. Mattie Boswell will also recover all costs paid by Mrs. Boswell or her estate in all courts.

II. The *Controversy Between Gillett And Cledys Boswell.* The Chancery Court found and decreed: (a) that Cledys Boswell and Gillett were never partners in the Gillett-Boswell enterprise; (b) that Cledys Boswell should pay into the Registry of the Court the sum of $755.30 received on fire insurance policies for the damage to the projection room and equipment and held by

---

[3] During the pendency of this case in the Supreme Court, and after the filing of her brief herein, Mrs. Boswell departed this life intestate. The administrators of her estate have been duly substituted, so the judgment herein for her is for the administrators of her estate.

him in a separate account; (c) that Cledys Boswell was entitled to judgment against Gillett for $1,000 for salary of $50 per week for only five months from the time of the fire; (d) that Gillett should receive all of the $7,000 from the sale of the picture show furnishings and equipment which had been sold by consent of all litigants in April, 1955, and paid into the Registry of the Court; and (e) that each party (Gillett and Cledys Boswell) should pay his own costs.

Gillett and Cledys Boswell have each appealed. Gillett insists: (a) that he and Cledys Boswell were partners; (b) that an accounting would show that Gillett lost approximately $24,000 net in the Boswell-Gillett venture, even after deducting the $7,000 received from the equipment; (c) that Gillett should have judgment against Cledys Boswell individually for one-half of the said loss, or a net judgment of approximately $11,700; and (d) that Gillett should have judgment against Cledys Boswell for damages at $500 per month from the time of the fire until the end of the lease since Cledys Boswell persuaded Mrs. Mattie Boswell to refuse her consent to the lease assignment. Cledys Boswell claims: (a) that he is entitled to a salary of $50 per week from the fire until possession of the building was returned to Mrs. Boswell in April, 1955; (b) that Gillett, instead of Cledys Boswell, was liable for the rent from May 1, 1952 to April 28, 1955; and (c) that Cledys Boswell should recover his costs.

A. *As To The Partnership Questions.* The Chancery Court held that there never was a partnership between Gillett and Cledys Boswell; that there was merely an employment contract, even though the instrument was designated as a partnership agreement. Gillett insists that the Chancery holding was erroneous.

As aforesaid, in May, 1947, E. R. Gillett and Cledys Boswell signed a 3-page instrument designated as a "Partnership Agreement." By reference, it incorporated in it the memorandum agreement between the parties of January 7, 1946, wherein Gillett agreed to install ". . . sufficient equipment in said building to operate

a first class picture show at his own expense . . ."
Cledys Boswell signed various papers designating the
Main Theater to be a partnership between himself and
Gillett: so certainly as regards third persons there was
a partnership created to operate the Main Theater.

But as between the parties — Gillett and Cledys Boswell — was there a partnership *inter se?*[4] We think the
answer to this question makes very little difference in
the final result in this case because, even if there was a
partnership *inter se,* still Gillett cannot recover from
Cledys Boswell any amount that Gillett lost on the furniture and fixtures in the theater. The reason that Gillett
is not entitled to judgment against Cledys Boswell, as in
ordinary partnership cases *inter se,* is because the losses
that Gillett claims in this case came about through Gillett's own wrong and in breach of the partnership relationship. In 47 C. J. 792, in discussing losses through
the negligence or misconduct of a partner, cases from
many states are cited to support the text: "But losses
caused by the acts of a partner which amount to a breach
of a partnership stipulation . . . or which are characterized by bad faith toward them (co-partners), must
be borne by him alone." And again in 47 C. J. 1172,
cases are cited to sustain this rule: "Losses due to a
partner's breach of the partnership contract, . . .
are to be borne by him exclusively." To the same effect, see 68 C. J. S. 538 and 68 C. J. S. 903, where
other and more recent cases are cited to sustain the rule

---

[4] The "partnership agreement" of May, 1947 contained these additional salient provisions: "The said E. R. Gillett having advanced
the necessary funds to finance both the litigation incident to obtaining
possession of the building in which said Main Theater is installed, as
well as the funds necessary for the alterations and improvements
made in connection therewith, it is agreed and understood that out of
the surplus accumulated in the above joint account he shall have the
right to withdraw from time to time such sums as can be spared from
said account until all the funds advanced by him have been repaid
in full. Provided: that there shall be kept in said account the sum
of at least One Thousand ($1000.00) Dollars to meet the rents and
other current expenses incident to the operation of said theater . . .
As soon as all the funds that have been advanced by the said E. R.
Gillett have been fully repaid to him, then it is understood and agreed
that the said E. R. Gillett and the said Cledys Boswell are thereafter
to be the joint and equal owners of all the improvements made to the
building in which said Main Theater is being operated, and the joint
and equal owners of all the net profits derived from the operation of
said theater . . ."

just quoted. A partnership is a relationship of trust and confidence and partners must observe the utmost good faith toward each other in all of their transactions from the time they begin negotiations with each other to the complete settlement of the partnership affairs. (See Gilmore on "Partnership," page 374).

And when a partner — such as Gillett in the case at bar — comes into a court of equity and seeks to recover judgment for losses, such partner must come in with clean hands and certainly cannot recover for losses caused by himself in breach of his duty and obligations as a partner. See Annotation 4 A. L. R. 83 discussing partnership cases. The evidence here shows that early in April, 1948 Gillett formed the plan to oust Cledys Boswell from the management of the picture show. Gillett had used Boswell to get the rent contract but Gillett decided to oust Cledys Boswell entirely. When the furniture and fixture notes were paid, Gillett had them assigned to a man named McFarland, who took orders from Gillett. Without any information from Gillett to Cledys Boswell (who had been using the proceeds of the picture show to pay on the notes), McFarland went to Russellville and informed Cledys Boswell that he (McFarland) owned the Main Theater and had bought everything from Gillett.

When Cledys Boswell refused to surrender his managership to McFarland, Gillett went to Russellville and sought to compel Cledys Boswell and his mother to agree to the assignment of the lease and the sale of the Main Theater. When Cledys Boswell refused, Gillett left the meeting and never spoke to Cledys Boswell again; and that is the reason that Cledys Boswell could get no response from Gillett after the fire in December, 1948. Furthermore, it is shown that the theatre could have been put back in operation within twenty days; but Gillett would never authorize any repairs to be made. Instead, he did just as he testified as heretofore quoted: "I had no intention of doing anything but to pay this $150 a month (rent)."

Were the actions of Gillett in these matters the actions of a partner toward a partner? Did he not breach the entire partnership contract — assuming it was a partnership *inter se* — when he assigned all the papers over to McFarland and tried to dispossess Boswell? The partnership agreement provided how Gillett could have effected a sale of his interest in the business:[5] that is, by giving Cledys Boswell the first right to acquire it. Gillett did not do that for the obvious reason that the sale of the partnership would not have carried with it the lease on the building and he could not compel Mrs. Boswell to agree to an assignment of the lease on the building. So Gillett violated the fiduciary relationship that should have existed between partners in order to try to "strong arm" Cledys Boswell and Mrs. Boswell into letting him have the building. The losses that Gillett suffered on his equipment came about through his own conduct and breach of the partnership contract; so he cannot recover a judgment against Cledys Boswell even if he were a partner *inter se*; and that part of the Chancellor's decree reached the correct result and is affirmed.

What we have just expressed, likewise disposes of Gillett's claim for damages against Cledys Boswell for $500 a month for his failure to persuade Mrs. Boswell to agree to the assignment of the lease contract.

B. *Cledys Boswell's Claim For Salary.* The Chancery Court allowed Cledys Boswell judgment against Gillett for $1,000 for salary as manager for twenty weeks after the fire. Gillett claims that Boswell was entitled to no salary after the fire; and Boswell claims that he was entitled to salary up to the final determination of the case. We cannot say that the Chancery Court was in error in the judgment that it rendered on this angle of

---

[5] The "partnership agreement" said: "It is mutually agreed and understood by and between the parties hereto that the agreements herein contained shall be binding upon each of said parties, their heirs, executors, administrators or assigns, so long as they desire to continue in the operation of said picture business. Provided that either of said parties may sell or dispose of his interest in said business, but should either desire to sell or dispose of his interest in said business, he shall give the other party the first right to acquire said interest at a price offered by any other *bona fide* purchaser. If the other party does not desire to purchase such interest, then he may sell to any other party agreeable to the remaining party to this agreement."

the case. Just because Gillett did not agree to continuation of the picture show after the fire was no reason why Cledys Boswell should sit still and do nothing. Within twenty weeks after the fire, Boswell certainly knew that he could get nowhere in his dealings with Gillett; and we think the Court allowed Boswell his salary for a reasonable time. Gillett certainly cannot complain of this salary allowance for twenty weeks, in view of all that we have heretofore said. Therefore, on this angle of the case, we affirm the decree of the Chancery Court.

C. *As To The Costs Between Cledys Boswell And Gillett.* The Chancery Court decreed that each of these parties should pay his own costs. We cannot tell from this record who was at fault in delaying this case so long. The Chancellor was in a better position to judge the determination of the costs than we are; and so we affirm the Chancery ruling as to costs between Cledys Boswell and Gillett, but with Mrs. Boswell's estate recovering all of her costs from Gillett.

The result is that the Chancery decree is affirmed in part and reversed in part; and the cause is remanded to the Chancery Court to enter a decree not inconsistent with this opinion.

Justices HOLT and MILLWEE dissent.