E. Leon NICHOLSON *v.* CENTURY 21, Ivy Realty, Inc., et al.

91-119 818 S.W.2d 254

Supreme Court of Arkansas
Opinion delivered November 4, 1991

162

*Thaxton, Hout, Howard, & Nicholson*, by: *E. Leon Nicholson*, for appellant.

*Wright, Lindsey & Jennings*, by: *Wendell L. Griffin*, for appellees.

ROBERT L. BROWN, Justice. The appellant, E. Leon Nicholson, appeals from a judgment for deceit in favor of the appellee, Billy C. Ivy, in the amount of $105,000. The judgment was in the nature of an indemnity for a judgment entered in like amount against Ivy for negligence and in favor of Maurice and Virginia Odom. Finding no error, we affirm.

This case involves the sale of real property known as Odom Skating Rink and Rental Property and the financing of that sale. On February 10, 1983, Maurice and Virginia Odom, who owned the realty, signed a listing agreement with Ivy as the broker to sell the property. The original listing agreement was for a price of $424,000. No prospective purchaser agreed to that amount. Thereafter, a second listing agreement was signed between the same parties on February 24, 1985, with an asking price of $390,000. Again, no buyer was found for the listed figure.

During this period, Ivy contacted Nicholson about purchasing the property. On June 4, 1985, Ivy and Nicholson agreed on a

purchase price of $275,000, and that figure was memorialized in an offer and acceptance signed by Nicholson which showed Nicholson and his father-in-law, Walter Allbright, as the buyers. The sale price was comprised of the assumption of a promissory note dated February 10, 1971, that was given by the Odoms to the original owner, Dan Holbrook, and his wife. That note was secured by a deed of trust on the real property. The offer to Nicholson and Allbright further entailed a down payment to the Odoms of approximately $50,000 and a note to the Odoms in the amount of $125,000 secured by a mortgage on the property to be sold. Attached to the offer was a list of 32 mobile homes in which the Odoms would have a security interest as additional collateral for the $125,000 note. The Odoms accepted the offer.

Between the offer and the sale's closing, the buyer changed from Nicholson and Allbright to a corporation formed by them named Popeye Investments, Inc. The corporation was formed on July 10, 1985, for the purpose of buying the Odoms' property. The Odoms agreed to a corporate purchaser but told their agent, Ivy, that they required personal guarantees from Nicholson and Allbright. Ivy testified at trial that he specifically told Nicholson that personal guarantees were required. Nicholson denied this assertion.

The sale closed at Nicholson's law firm on July 22, 1985, with Popeye purchasing the property. The Odoms were given a corporate note from Popeye with no personal guarantees and no security interest in the mobile homes. They also received a down payment of $52,242.99; of that amount $13,200 was paid to Ivy for his services. The down payment was financed by a loan to Popeye from the Bank of Tuckerman, secured by a second mortgage on the real property. A security interest in the 32 mobile homes was also given by Popeye as additional collateral for the loan. Both Nicholson and Allbright personally guaranteed the loan.

At the closing, Nicholson, who is an attorney, represented his interest as a principal of Popeye. The Odoms did not have counsel present. Ivy testified at trial that Nicholson had said his law firm would prepare the documents and that separate counsel was not necessary. Maurice Odom also testified that Ivy told him that Nicholson had said separate counsel was unnecessary. It is

not disputed that Nicholson's law firm prepared the warranty deed and bill of sale for the Odoms and that Nicholson personally prepared the remaining documents. Nicholson disputed giving any advice on whether the Odoms should have independent counsel. Also at closing Mr. Twyford and Mrs. Twyford, the son-in-law and daughter of the first mortgagee, Dan Holbrook, testified that they raised the issue of personal guarantees by Nicholson and Allbright, because Popeye was giving Holbrook a new note to replace the 1971 Odom note. They were assured that guarantees were not necessary, because Holbrook would still retain a first mortgage on the property. Ivy and the Odoms deny hearing any discussion of personal guarantees at the closing.

The day after the sale to Popeye, the corporation sold the property to Harold Calhoun, who had managed it for several years, for $400,000. After a few months Calhoun defaulted and the property was sold to the First Apostolic Church, which also defaulted approximately one year later. The Bank filed a foreclosure action on its second mortgage and joined Popeye and the Odoms as parties defendants. After judgment in favor of the Bank, Nicholson and Allbright purchased the property at the foreclosure sale for $62,150, in full satisfaction of the Bank's debt. The Odoms were awarded judgment against Popeye but received nothing at the foreclosure sale on the Popeye note, because Popeye had no assets, and the proceeds from the foreclosure sale were not sufficient to pay off the Odoms's third mortgage.

As part of the Bank's foreclosure suit, the Odoms filed a third party complaint against Ivy and alleged negligence due to Ivy's failure to obtain personal guarantees of the Popeye note from Nicholson and Allbright. Ivy in turn filed a cross claim against Nicholson for indemnity. After full trial before the chancery court, judgment was entered in favor of the Odoms and against Ivy, and Ivy was awarded judgment over against Nicholson for deceit for the amount that Ivy was required to pay the Odoms — $125,000.

For his first point, Nicholson contends that the chancery court erred in making numerous findings of fact. He says that taken individually or as a whole, these errors in the court's findings mandate reversal in a case where a fraudulent course of

conduct is at issue. We discuss those findings seriatim:

1. The court found that Mr. Twyford discovered for the first time at closing that Popeye was going to be substituting a new note to replace the note given to Holbrook by the Odoms and that the note was to be liberalized. Nicholson argues error in that both Twyfords were aware in advance of closing that a liberalized replacement note would be given.

2. The court found that Ivy told Mr. Twyford that the individuals would be the makers on the note, and nothing was said about a corporate maker. Nicholson argues error in that this implies that the Twyfords were not aware of the Popeye note until closing. This is not correct, according to Nicholson, since Mrs. Twyford testified that she knew it was going to be a corporate note before closing.

3. The court found that Nicholson did not do a title opinion on the property for the Odoms, but he had done one for the Bank in anticipation of the second mortgage and the financing for the down payment. Nicholson argues error in that his law firm, not he, prepared the title opinion for the Bank. Moreover, he argues that the Odoms were not looking to him for a title opinion or legal counsel.

4. The court found that the Odoms received $38,042.99 in cash at closing. Nicholson argues error in that this omits the $13,200 commission that was paid to their real estate broker, Ivy. When that is factored in, the total payment to the Odoms at closing was $51,242.99.

5. The court found that Popeye was capitalized with only $300. Nicholson argues error in that Popeye in fact received $55,000.00 from the Bank, of which $51,242.99 was then paid to the Odoms as a down payment.

6. The court found that Nicholson told Mr. Odom at closing that the Popeye note was "just like cash." Nicholson argues error in that this statement was made solely for the purpose of impressing upon Odom

the need to put the note in a safe place.

7. The court found that Nicholson assumed the role of buyer, closing attorney, attorney for Popeye, attorney for the buyer, and attorney for the seller at closing. Nicholson argues error in that three of those roles — attorney for Popeye, attorney for the buyer, and the buyer — are one and the same. Also, his law firm only charged $75 for preparing the warranty deed and bill of sale for the Odoms, and Ivy was representing the Odoms while the Twyfords were there on behalf of Holbrook.

8. The court found that it was "unbelievable" that a third mortgagee financing an amount twice the size of the second mortgagee would not receive the same protection such as personal guarantees that the second mortgagee received. Nicholson argues error in that a nervous seller who had not gotten his first or second asking price might well agree to no personal guarantees, especially when the seller could easily have believed that the value of the real property exceeded the total indebtedness.

 Nicholson concludes that these allegations of error by the chancellor militate against a judgment for deceit which must be proven by "clear and convincing evidence." That, however, is not the standard of proof for cases in deceit, when alteration of a solemn writing is not involved. *See Grendell* v. *Kiwhl*, 291 Ark. 228, 723 S.W.2d 830 (1987); *Clay* v. *Brand*, 236 Ark. 236, 365 S.W.2d 256 (1963). Rather, the standard for deceit is preponderance of the evidence. *Id.* We hold that there is factual justification in the record for each of the chancellor's findings of fact, and we are not prepared to say that any one of the eight is clearly erroneous under Ark. R. Civ. P. 52(a), or that in combination they are of sufficient magnitude to warrant reversal of the judgment.

██ For his second point, Nicholson urges that the facts of the case do not support a judgment in deceit. We have held that five elements establish the tort of deceit: a false representation of a material fact; knowledge or belief on the part of the person making the representation that the representation is false or that

there is not a sufficient basis of information to make such a representation; an intent to induce the other party to act or refrain from acting in reliance upon the misrepresentation; a justifiable reliance upon the representation by the other party in taking action; and resulting damages. *See Brookside Village Mobile Homes* v. *Meyers*, 301 Ark. 139, 782 S.W.2d 365 (1990); *MFA Mutual Insur. Co.* v. *Keller*, 274 Ark. 281, 623 S.W.2d 841 (1981).

■ In cases of deceit the credibility of the witnesses is all important in determining liability, and it is the trier of fact that is the sole judge of the credibility of the witnesses and of the weight and value of the evidence. *See Fuller* v. *Johnson*, 301 Ark. 14, 781 S.W.2d 463 (1989). In the case before us, the chancellor was the trier of fact, and he had the opportunity to observe the witnesses, judge their credibility, and weigh the value of their testimony.

It is undisputed that Nicholson, as attorney for Popeye and one of its principals, made no effort to obligate himself personally to the Odoms for the balance of the purchase price. Dan Holbrook, who was given a note by Popeye without guarantees, had a first mortgage on the property. The Bank as second mortgagee had a Popeye note but also personal guarantees and a security interest in the mobile homes. Only the Odoms held a Popeye note secured by a third mortgage but with no other protection.

The chancellor placed great emphasis on the fact that Nicholson had taken pains to make the Bank secure with personal guarantees and a security interest in the mobile homes, but he had failed to afford the Odoms similar protection. This discrepancy in treatment was found to be significant evidence of the deceitful activity complained of. He further took note of the multiple roles played by Nicholson at closing and particularly of the fact that Nicholson's law firm had provided legal services to the Odoms, who were not represented by counsel at the closing.

■ In sum, there was substantial evidence of record that Nicholson agreed to the personal guarantees and a security interest in the mobile homes in his offer but then prepared closing documents that did not reflect this fact. By this action the Odoms were induced to complete the sale under the misapprehension that the Popeye note would be guaranteed and that additional

security would be given, and they were damaged. Under these facts the five elements establishing deceit were present, and we so hold.

■ We finally consider appellee Ivy's motion for costs on grounds that he was impelled to incur these costs due to Nicholson's deficient abstract. We do not agree. The abstract filed by Nicholson in conjunction with his brief was sufficient to determine the issues raised on appeal. *See Goodloe v. Goodloe*, 253 Ark. 550, 487 S.W.2d 593 (1972).

The judgment of the chancellor is affirmed. The appellee's motion for costs is denied.

NEWBERN, J., concurs.

DAVID NEWBERN, Justice, concurring. The Chancellor found that Billy Ivy was negligent in not seeing to it that, after the Odoms and Nicholson and Allbright had agreed to new terms, the offer and acceptance document was not revised. Ivy was also found negligent in accepting Nicholson's recommendation, and passing it on to the Odoms, that the Odoms did not need independent counsel for the complex real estate transaction.

The Chancellor concluded the injury to the Odoms resulting from Ivy's negligence would not have occurred if Nicholson had not misrepresented to Ivy that Nicholson and Allbright remained personal guarantors of the obligation to the Odoms of the note to them from Popeye Corporation. It was on this basis that the Chancellor held that, despite Ivy's negligence, Ivy was entitled to be indemnified by Nicholson for the entire damages to be paid to the Odoms.

Nicholson argues the elements of the tort of deceit have not been satisfied. If we pursue the matter in the way he suggests, we will raise the question whether a chancellor should ever try an intentional tort claim as an "incident" to another matter of which the chancellor has jurisdiction. We need not do so.

We should be dealing here with the law of indemnity rather than the law of deceit. The question is not whether the elements of deceit were satisfied. The question is whether indemnity was proper. By way of an *obiter dictum* this Court stated in *Larson Machine, Inc. v. Wallace*, 268 Ark. 192, 213-14, 600 S.W.2d 1,

12 (1980):

> It has been appropriately stated that the doctrine of indemnity is based upon the equitable principles of restitution which permit one who is compelled to pay money, which in justice ought to be paid by another, to recover the sums so paid unless the payor is barred by the wrongful nature of his own conduct.

Although the Chancellor could have found that Nicholson's conduct in this case fit the elements of deceit, it was only necessary that it be shown, as a matter of equity, that Nicholson's misrepresentations were such that he should reimburse Ivy for the amount that Ivy was found to owe the Odoms.

It is not necessary to find that Nicholson committed a tort to require equitable restitution from him to Ivy; however, a case in which restitution of one tortfeasor by another was discussed presents a good analogy. A survey of Arkansas indemnity law, was provided by the United States Court of Appeals for the Eighth Circuit in *Merrill Lynch v. First Nat. Bank of Little Rock*, 774 F.2d 909, 918 (1985). The discussion of the matter of indemnity between tortfeasors was as follows:

> The third type of indemnity case is characterized by breaches of different duties owed by the tortfeasors to the injured party. Product-liability actions and defective-premises cases give us most of the case law in this area. In the typical case of this kind the supplier of a defective product is found liable to the injured consumer (on a strict-liability or warranty theory) but is allowed indemnity from the manufacturer of the product apparently on the ground that that manufacturer's negligence in producing a defective product is more direct and palpable that the supplier's failure to discover the defect. As in the case of imputed liability, the justification for indemnity disappears if the supplier was himself proximately at fault for failing to inform the consumer of a *known* defect. *Harrell Motors, Inc.* v. *Flanery*, 272 Ark. 105, 612 S.W.2d 727 (1981) [Footnote omitted, emphasis in original.]

While it might be troublesome to some scholars of the law of indemnity that an equitable remedy transfers liability from one

tortfeasor to another, leaving one of them with no liability whatever, the analogy to the manufacturer-seller is apt. If Ivy had been found to have *known* the legal documents prepared by Nicholson and his law firm were contrary to Nicholson's assurances, then presumably total indemnity would not have been proper. Here, however, Ivy was relying on Nicholson's legal expertise to effect Ivy's understanding of the deal as well as that of the parties.

While I concur in the result reached by the Court, I do so on the basis that indemnity by way of equitable restitution was proper rather than on the basis that Nicholson was guilty of the tort of deceit.