Vera L. STINE (Davis) *et al. v.* Bucky SANDERS *et al.*

CA 98-110 987 S.W.2d 289

Court of Appeals of Arkansas
Divisions II and III
Opinion delivered March 24, 1999

*John P. Lewis, P.A.*, by: *John P. Lewis*, for appellants.

*Crawford Law Firm*, by: *Michael H. Crawford*, for appellees.

JOHN MAUZY PITTMAN, Judge. The appellees brought an action against the appellants alleging that appellants committed the torts of deceit and interference with a business expectancy during the purported purchase of appellees' business by the appellant, Don Davis. After a jury trial, a verdict was returned in favor of appellees on the issue of deceit, and a judgment was entered assessing damages in the amount of $60,000 against appellant Don Davis and in the amount of $65,000 against appellant Vera Stine. The $65,000 assessed against appellant Vera Stine

included $5,000 in punitive damages. From that decision, comes this appeal.

For reversal, appellants contend that the evidence is insufficient to support the jury's finding of deceit; that the evidence is insufficient to support the punitive damage award against appellant Vera Stine; and that the trial court erred in denying appellants' motion for a new trial. We affirm.

We first address appellants' contention that the evidence is insufficient to support the jury's finding of deceit. The tort of deceit consists of five elements that must be proven by a preponderance of the evidence: (1) a false representation of material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance. *Roach v. Concord Boat Corp.*, 317 Ark. 474, 880 S.W.2d 305 (1994). Our standard in reviewing the sufficiency of the evidence is well settled: (1) the evidence is viewed in a light most favorable to the appellee; (2) the jury's finding will be upheld if there is any substantial evidence to support it; and (3) substantial evidence is that of sufficient force and character to induce the mind of the fact-finder past speculation and conjecture. *Medlock v. Burden*, 321 Ark. 269, 900 S.W.2d 552 (1995). In cases of deceit, the credibility of the witnesses is vital in determining liability, and the trier of fact is the sole judge of the weight and credibility of the evidence. *Id.*[1]

---

[1] Mr. Davis testified that he never offered to purchase appellant's business. Mr. Sanders testified that Davis did make such an offer. This conflict in the testimony is the crux of this case. The jury believed Mr. Sanders. The dissenting judge does not, and the dissent is founded on the premise that no offer to purchase was made. This rejection of the jury's credibility determination concerning the central issue in this case is contrary to a long line of authorities holding that, in cases of deceit, the credibility of the witnesses is *all important* in determining liability, *Ellis v. Liter*, 311 Ark. 35, 841 S.W.2d 155 (1992), and that in such cases the jury is the *sole judge* of the credibility of the witnesses and the weight and value of the testimony. *Id; Nicholson v. Century 21*, 307 Ark. 161, 818 S.W.2d 254 (1991). In cases of deceit, the resolution of conflicts in the testimony is fundamentally a function of the jury, especially where credibility of the witnesses is involved, and the jury's findings are usually conclusive. *Firstbank of Ark. v. Keeling*, 312 Ark. 441, 850 S.W.2d 310 (1993). Although we respect the learned dissenting judge's views regarding the credibility

Viewing the evidence, as we must, in the light most favorable to the appellees, the record shows that appellees are the owners of a security business, Sanders Security and Detective Corporation. They sought to sell their business in October 1994, and advertised the business for sale for an asking price of $200,000 in newspapers in Little Rock and Dallas. Appellant Don Davis saw one of the advertisements and contacted appellees regarding purchase of the business. Mr. Davis met with Mr. Sanders and discussed various aspects of the business. Appellant Vera Stine, who was employed by appellees as manager of their business, provided Mr. Davis with an informational packet listing some of the clients of the business and the income derived from those clients. She also, in further-ance of the prospective sale of the business, took Mr. Davis to several business clients of Sanders Security. Mr. Davis met with appellees' attorney and was provided with information regarding the tax debt of the business, tax returns, and additional financial documents. Mr. Davis then met with Mr. Sanders at the offices of Sanders Security on November 4, 1994. Mr. Davis and Mr. Sand-ers reached an oral agreement for the sale of the business for $120,000, and Mr. Davis agreed to provide a check for the purchase price from his accountant the next week. However, although Mr. Davis never canceled the agreement, no check was ever provided. At about this same time, Ms. Stine quit her job as manager of Sanders Security following an argument with Mrs. Sanders. Her last day of work for Sanders Security was November 7, 1994. Although Ms. Stine told appellees that she was going to work for University Mall, she did not do so. Unbeknownst to appellees, she began a romantic involvement with Mr. Davis that culminated in their engagement to be married. Ms. Stine obtained her own security license on November 9, 1994, and, together with Mr. Davis, formed a rival security business, Inter-state Security and Investigations.

The rival business was staffed with former employees of Sanders Security who were induced to defect by appellants. Where Sanders Security had sixty-five employees when Mr. Davis

---

of the witnesses and the weight to be given their testimony, we do not adopt them because the resolution of conflicts in the testimony is simply not within the province of the appellate court. *Id.*

agreed to purchase the business, one month later Sanders Security had only five remaining employees, the rest having gone to work for appellants at Interstate Security. Such defections would normally have been impossible, because it was standard practice for Sanders Security to have its employees execute an agreement not to work for competing firms.[2] However, the records of these agreements were missing. The office secretary for Sanders Security, Cora Maglero, continued to work for Sanders until November 14, 1994. She gave appellees no notice of her intent to quit her job. On Ms. Maglero's last day of work, a housekeeping employee saw her printing a great many documents from the office computer, although she had not been asked to print out anything. She told the housekeeping employee that she had to get the documents off the computer before she left, and was seen taking the documents out and placing them in the back seat of her red convertible. Ms. Maglero then returned to the office and continued to work on the computer. Later that day, the housekeeping employee saw Ms. Maglero's auto parked at Ms. Stine's house, and she continued to see Ms. Maglero's car parked there every day, morning and night. Ms. Maglero admitted that she went to work for Ms. Stine. Following Ms. Maglero's departure from Sanders Security, it was discovered that the business data on the company computer had been completely deleted. Diagnostic tests showed that an enormous amount of printing had been done on the days immediately preceding Ms. Maglero's departure, and that the business information had been deleted on Ms. Maglero's last day of work.[3]

---

[2] The dissent is simply wrong in stating that there is no evidence that employees signed documents preventing them from going to work for competing security companies. After generally describing the nature of the documents, Mrs. Sanders testified that "[i]f we would have had the documents that had been taken from the files of the men, then they would not have been able to go to work for Interstate, but the documents were taken out of their files." There was no objection to this testimony. Without a doubt, it would be preferable to examine the documents themselves in this instance but, in their absence, to refuse to credit Mrs. Sanders's testimony regarding their contents would be to unjustly reward the parties who stole them.

[3] Conceding that Ms. Maglero printed a large number of documents and removed them to her auto on her last day of work, the dissent nevertheless makes the somewhat puzzling assertion that there is no evidence that Ms. Maglero took any of the company's missing employee records. Although it is true that no eyewitness could testify concerning

Staffed with appellees' employees, appellants' rival company soon obtained appellees' clients as well. Anthony Timberlands, Turf Catering, Oaklawn Jockey Club, Nickle Molding, and Lauray's Jewelers canceled their contracts with appellees shortly after the date of the sale agreement and obtained security service from the rival company. Several of these firms had been clients of the appellees for twenty years. Several of the firms canceled their contracts with appellees upon learning that appellees' workers' compensation insurance coverage had lapsed. Ms. Stine was responsible for maintaining workers' compensation insurance for appellees' business, and had been contacted by the insurance agent regarding the problem, yet Ms. Stine neither reinstated the coverage nor informed appellees about the problem.[4]

---

exactly which documents were printed by Ms. Maglero and placed in her auto before she left work for the last time, it is clear that the employee records, including the vital noncompetition agreements, were missing; that Ms. Maglero had control of the computer at the time in question; that Ms. Maglero had not been asked to print anything; that an enormous amount of printing was nevertheless done; that Ms. Maglero was in a hurry to accomplish this printing before she left the office for the last time; that the printed documents were deposited in Ms. Maglero's automobile; that this automobile was immediately thereafter seen parked at Ms. Stine's house; and that Ms. Stine contemporaneously founded a rival business by which Ms. Maglero was employed. When considered in light of Ms. Maglero's somewhat dubious explanation of her reason for her hasty departure from appellants' employ, and of the evidence that the business records on the computer were subsequently found to have been completely deleted on Ms. Maglero's final day of work, the evidence that Ms. Maglero took the missing employee records is compelling. Fraud and deceit are, by their nature, frequently accomplished in secret and, despite the dissent's implication to the contrary, it is not necessary that fraud be shown by direct evidence or positive testimony. *Pacini v. Haven*, 194 Ark. 31, 105 S.W.2d 85 (1937). Circumstantial evidence can provide a basis for the jury to infer fraud where, as is manifestly the case here, the circumstances are inconsistent with honest intent. *Id; Interstate Freeway Services, Inc. v. Houser*, 310 Ark. 302, 835 S.W.2d 872 (1992).

[4] It would, as the dissent observes, be speculative at best to suggest that Ms. Stine foresaw when she failed to inform appellants of the lapse of insurance coverage in August 1994 that Mr. Davis would arrive from Dallas two months later and offer to buy the business. We made no such suggestion. The fact remains, however, that Ms. Stine was employed as manager of appellants' business, that as their agent she owed them the utmost good faith and loyalty, and that she was required at all times to make full disclosure of any facts damaging to her principals. *Toney v. Haskins*, 7 Ark. App. 98, 644 S.W.2d 622 (1983). We think this duty was a continuing one, and that Ms. Stine was as much obliged to report the ultimately disastrous lapse in coverage to her employers in October as she was in August. Furthermore, as manager in total control of appellants' business, Ms. Stine owed appellants a fiduciary duty. *See Tandy Corporation v. Bone*, 283 Ark. 399, 678 S.W.2d 312

After Ms. Stine's departure, appellees learned about the problem from clients calling to cancel their contracts with Sanders on the grounds that Sanders was in breach for failure to maintain workers' compensation insurance. Telephone records showed that Ms. Stine telephoned many of these clients from her home within one week of the date of the agreement.

■ In arguing that the evidence is insufficient to support a finding of deceit, appellants list the actions of Mr. Davis and Ms. Stine separately and urge us to reverse because the evidence does not show that either appellant committed all the acts that would satisfy all five elements of deceit. We do not agree. It is not necessary for a single person to perform all the acts constituting fraud where two persons participate in a fraudulent scheme. Each party to a fraudulent transaction is responsible for the acts of others in furtherance of the fraudulent scheme, and all who participate are liable for the fraud. 37 C.J.S. *Fraud* § 83 (1997); *see, e.g., Medlock v. Burden*, 321 Ark. 269, 900 S.W.2d 552 (1995); *Malakul v. Altech Arkansas, Inc.*, 298 Ark. 246, 766 S.W.2d 433 (1989).

■ Appellants also contend that there is no substantial evidence to show that Mr. Davis agreed to purchase the business. However, Mr. Sanders clearly testified that, after investigation and negotiation, Mr. Davis agreed to purchase the business for $120,000. Mr. Sanders's credibility was a question within the sole province of the jury, *see Medlock v. Burden, supra,* and, having been found to be credible, his testimony constitutes substantial evidence that an agreement was reached.

■ ■ Appellants further contend that an agreement to purchase the business was not the sort of misrepresentation for which deceit will lie because it was not a misrepresentation of a present fact, but was instead merely a promise to do something in the future. Although it is true that, as a general rule, a promise of future conduct may not form the basis for a claim of fraud or deceit, *Golden Tee, Inc. v. Venture Golf Schools, Inc.*, 333 Ark. 253, 969 S.W.2d 625 (1998), this rule will not apply if the party mak-

(1984). The dissent would, in effect, set the concept of fiduciary duty on its head by holding that the great trust and confidence bestowed upon Ms. Stine by the appellants barred them from complaining of any subsequent breach of that trust.

ing the false promise knew at the time it was made that it would not be kept. *Undem v. First National Bank,* 46 Ark. App. 158, 879 S.W.2d 451 (1994). The intent of the promisor in this regard is a question of fact. *Id.* We think that the evidence in this case, including the evidence that Mr. Davis agreed to purchase the business on November 4; that, without notifying the appellees, he formed a rival business with appellees' employees and clients on November 9; that appellees' business records were wrongfully taken to further the formation of the rival business and wrongfully destroyed to hinder appellees from taking timely corrective measures; and that Mr. Davis subsequently denied making the agreement — a denial that the jury found to be false — was sufficient evidence to permit the jury to find that Mr. Davis did not intend to purchase the business when he promised to do so.

Appellants next contend that, in the absence of a written agreement, appellees had no right to rely on Mr. Davis's promise to purchase the business. There are no Arkansas cases on point, and there is a division of authority on the question of whether the statute of frauds will bar an action for fraud even though the promise underlying the fraud is itself unenforceable under the statute. *See generally* 37 C.J.S. *Statute of Frauds* § 140 (1997). We think that the better rule, however, is that the statute of frauds does not abrogate the common-law remedy for fraud merely because the fraudulent misrepresentation was not in writing. *See, e.g., Hanson v. American National Bank & Trust Co.,* 865 S.W.2d 302 (Ky. 1993). This view is the logical corollary of the rule, which has long been the law in this state, that fraud may be predicated on promises made with the intent not to perform them. In both cases, the gist of the fraud is not the breach of the agreement to perform, but is instead the fraudulent intention and representation of the promissor. *See Pierce v. Sicard,* 176 Ark. 511, 3 S.W.2d 337 (1928). Arkansas courts have consistently held that the statute of frauds is designed to prevent fraud, not shield or effectuate it, *Betnar v. Rose,* 259 Ark. 820, 536 S.W.2d 719 (1976), so that the statute will not be allowed to be an instrument of fraud either in permitting one guilty of fraud to shelter himself behind it

or in allowing its use as a means of perpetrating fraud. *Bolin v. Drainage District No. 17*, 206 Ark. 459, 176 S.W.2d 143 (1944).[5]

The action in the present case was not one to enforce the agreement, but is instead based upon facts that grew out of the making of the agreement, and proof of the oral agreement was offered only to show that a fraudulent representation had been made. To interpret the statute of frauds as barring an action for damages resulting from such a fraudulent representation would be to allow the statute to be used as an instrument of fraud. *See Nanos v. Harrison*, 97 Conn. 529, 117 A. 803 (1922).

 ██ Appellants further contend that there is no evidence that appellees actually relied upon any misrepresentation. In this context it is important to note that there was evidence of two deceptions practiced on appellees: Mr. Davis's representation that he would buy the business, and Ms. Stine's concealment of material facts surrounding the sale. Nondisclosure of material facts may be a basis of recovery for fraud where there is reliance on the failure to disclose those facts. *Copelin v. Corter*, 291 Ark. 218, 724 S.W.2d 146 (1987). In the case at bar, Mr. Sanders testified that he believed Mr. Davis's representation that he would buy the business, and we think that the jury could infer that Mr. Sanders believed that the business was in a brief transition period while he awaited the payment that Mr. Davis promised to bring. There was also evidence that Ms. Stine remained employed by appellees during this period. Ms. Stine, who as manager of Sanders Security controlled virtually every aspect of the business, owed appellees a fiduciary duty, *Tandy Corporation v. Bone*, 283 Ark. 399, 678 S.W.2d 312 (1984), and we think that, on this record, the jury could properly infer that appellees relied on Ms. Stine to continue to act in good faith towards them and to disclose any facts within her knowledge that were detrimental to their business during the

---

[5] Both *Betnar* and *Bolin* are, as the dissent notes at some length, distinguishable because the agreements in those cases were partially performed. This distinction is irrelevant in the present case because both *Betnar* and *Bolin* involved actions to enforce the agreement, whereas the action in the present case was not to enforce the agreement, but to recover damages resulting from the fraudulent misrepresentation itself. In the context of this case, *Betnar* and *Bolin* are significant only as statements of the general proposition that the statute of frauds will not be allowed to be used as an instrument of fraud.

period leading up to the sale and the brief transition period thereafter. We find no error on this point.

 Next, appellants contend that appellees suffered no damage as the result of their reliance on any misrepresentations. They argue that this is demonstrated by the fact that appellees were owners of Sanders Security at the time of the purported sale, and that appellees continue to be owners of Sanders Security to the present day. This argument is somewhat disingenuous, for it ignores the evidence that Mr. Davis, having agreed to purchase Sanders Security, failed to do so but nevertheless obtained the profit-making aspects of that business, *i.e.*, its clients, business records, and employees. We think that the evidence supports a finding that this was achieved by the concerted efforts of appellants to induce Mr. Sanders to believe he had sold the business, a belief that helped distract attention from the loss of key employees and the depredations practiced by Ms. Stine in obtaining the clients, business records, and employees of the business — depredations that were largely accomplished during the brief but crucial period immediately following Mr. Davis's representation that he would purchase the business. We think that the record also contains substantial evidence to show that Ms. Stine, while employed in a fiduciary capacity, undermined the business by failing to pay the workers' compensation premiums or inform her employers of the problem, and that her concealment of this incident led to breaches of Sanders Security's agreements with its clients and the resultant termination of those contracts. We also think that the evidence that Ms. Maglero went directly to Ms. Stine's home with a large stack of documents printed on Ms. Maglero's unannounced last day of work for Sanders Security, together with the evidence that Ms. Maglero thereafter went to work for Ms. Stine's rival company, supports an inference that Ms. Stine and Ms. Maglero worked in concert to wrongfully remove and destroy business records belonging to their former employer. Finally, we think that there is substantial evidence to show that the removal and destruction of these business records made it impossible for appellees to prevent the defection of its employees and severely handicapped the company in competing with appellants' rival firm thereafter. Appellants also argue that appellees were not damaged

by their misrepresentations because appellees' business was in such serious financial difficulty that it was, in any event, bound to fail. However, it is not necessary that the misrepresentation be the sole cause of the injury:

> It has been held that although the fraud does not cause substantial damage apart from the happening of subsequent events which reasonably may be expected to happen, if these do happen the defendant is chargeable with the natural consequences of his act. In such case, he cannot complain that these supposed facts followed as conditions concurring with his fraud to cause the damage, if his fraud was planned in reference to the probability that these events would follow. . . . Fraudulent representations or misrepresentations need not be the sole cause of loss in order to be actionable; it is sufficient if they are a material inducement or an essential, material, or inducing cause.

37 AM. JUR. 2d *Fraud and Deceit* § 293 (1968). On this record, we cannot say that the jury could not have found that appellees were damaged by appellants' misrepresentations, and we hold that there was sufficient evidence to support the jury's finding for deceit against appellants.

Appellants next contend that the trial court erred in denying their motion for a new trial on the ground that the verdict was contrary to the preponderance of the evidence. The test on appeal from the denial of a motion for a new trial is whether the verdict is supported by substantial evidence. *Gilbert v. Shine,* 314 Ark. 486, 863 S.W.2d 314 (1993). In light of our holding that there was sufficient evidence to support the jury's verdict, we find no error on this point.

Finally, appellants assert that there was insufficient evidence to support the jury's verdict of $5,000.00 in punitive damages against Ms. Stine. We disagree. Although in ordinary cases, recovery of exemplary damages will not be allowed in an action of deceit unless the wrong involves violation of a duty springing from a relation of trust and confidence, or the fraud is gross, or there are extraordinary or exceptional circumstances clearly indicating malice and willfulness, *see Dodge v. Moore,* 251 Ark. 1036, 479 S.W.2d 518 (1972), there was evidence in this case that Ms. Stine stood in a relation of trust and confidence to the

appellees. Furthermore, in law, malice is not necessarily personal hate, but is rather an intent and disposition to do a wrongful act greatly injurious to another, *id.*, and we think the evidence supports a finding that Ms. Stine was motivated by such an intent in her dealings with appellees.

Affirmed.

ROBBINS, C.J., and GRIFFEN, STROUD, and MEADS, JJ., agree.

BIRD, J., dissents.

SAM BIRD, Judge, dissenting. I respectfully dissent from the majority opinion in this case because I believe that the evidence presented by the appellees was insufficient as a matter of law to establish the tort of deceit, and that the trial court should have granted appellants' motion for directed verdict. While I recognize that it is our responsibility, on review, to view the evidence in the light most favorable to the appellees, I do not think that our standard of review permits us to embellish the evidence by drawing inferences or conclusions from it that are not supported by it or are, at best, speculative. That is what I believe that the majority has done in straining to affirm the jury's verdict in this case.

The "facts," as recited by the majority, attempt to portray a sinister plot by the appellants to steal the appellees' business by suggesting: (1) that Vera Stine, the trusted manager of the Sanderses' security and detective company, deliberately let the company's workers' compensation insurance lapse so its customers would take their business elsewhere; (2) that Stine and Davis "induced" Sanders's employees to quit and go to work for them, and prevented Sanders from enforcing non-competition agreements against those employees by taking away the non-competition agreements; (3) that Stine and Davis deceived the Sanderses by not telling them about their romantic involvement; (4) that Davis agreed to pay the Sanderses $120,000 for their business, and since he did not do so and did not let them know that he was not going to do so, he must have intended to deceive them; and (5) that although the alleged purchase agreement was not in writing and, therefore, not enforceable under the statute of frauds, the

Sanderses can recover, nonetheless, because the unenforceable agreement was deceitful.

These five bases for the majority decision are discussed below. The problem with the majority's reasoning is that the facts and the law do not support any of them.

### (1) Lapse of Workers' Compensation Coverage

Regarding the workers' compensation insurance coverage, the undisputed facts were that a disagreement with the Arkansas workers' compensation carrier about the amount of the premiums arose prior to August of 1994 because a payroll audit resulted in an attempt by the carrier to charge the company a premium on work being performed in Louisiana. Ms. Stine, as manager of Sanders's company, and in whom the Sanderses testified they had entrusted full management authority, disputed the attempted premium assessment on Louisiana payroll and undertook to provide information requested by the insurance carrier that would result in a lower premium. When the dispute was apparently not resolved, the carrier's agent (Harris Shuffield) sent a cancellation notice to the Sanderses' company in mid-August (Shuffield said it was either August 14 or 18), informing the company that the policy would lapse in thirty days, or about mid-September 1994, if the premium was not paid. The significance of these dates is that appellant Don Davis had not even made contact with the Sanderses to inquire about their business being for sale at that time. In fact, the testimony of both the Sanderses and Davis was that Davis first came to Hot Springs from Dallas in mid-October 1994. It was not until then, and the weeks that followed, that Davis, with the knowledge and consent of the Sanderses, was provided with unrestricted information about the Sanderses' business, its clients, its profits, and its extensive tax liabilities.

To attribute some evil motive to Ms. Stine's handling of the workers' compensation premium dispute, one would have to assume that she foresaw, prior to August 1994, that Don Davis, of whose existence she was then unaware, would be arriving from Dallas two months later, that the lack of workers' compensation insurance that she is alleged to have brought about would cause

the Sanderses' clients to change security companies, and that Stine and Davis would hatch a plot to tell the Sanderses that Davis was going to buy their business (presumably to keep anyone else from doing so) in order to give them time to steal away the Sanderses' customers and employees while the Sanderses' business crumbled down around them.

To suggest, as the majority opinion does, that Ms. Stine secreted information from the Sanderses about the lapse of their workers' compensation insurance is simply not supported by anything in the record. The evidence is undisputed that the Sanderses had totally relinquished all control and management of their business to Ms. Stine. In their testimony, both Bucky and Frances Sanders conceded that all aspects of the business were under the absolute control of Ms. Stine, and that they had not, for at least ten years, had anything to do with the management or operation of the business. Neither Mr. nor Mrs. Sanders knew how many employees the business had, who its clients were, or how much money it made, if any. Why, after ten years, would they have expected to receive from Ms. Stine a report about the status of payment of the workers' compensation insurance premium?

*(2) Interference with Enforcement of Non-Competition Agreements*

The majority opinion also suggests that Davis and Stine induced Sanderses' employees to quit, and that they, somehow, prevented the Sanderses from enforcing documents that the employees signed agreeing not to go to work for competing security companies. There is simply no evidence in the record to support this statement by the majority. The only evidence relating to any kind of an agreement signed by Sanders's employees was the testimony of Frances Sanders who stated that when an employee came to work for Sanders, they signed an agreement that *they would not go to work for any of Sanders's customers.* Although Mrs. Sanders testified that "[i]f we would have had the documents that had been taken from the files of the men, then they would not have been able to go to work for Interstate," she offered no explanation of how an agreement by Sanders's employees not to go to work for Sanders's customers would have prevented those employees from going to work for Interstate, which was never a

Sanders customer. Not one of more than sixty of Sanders's former employees was called to verify that they ever signed any agreement not to go to work for competitor security companies. In the absence of any evidence whatsoever, the majority concludes that it was "standard practice" for Sanders Security to have its employees execute an agreement not to work for competing security firms.

There was no evidence of anything that Davis or Stine did to prevent the Sanderses from enforcing whatever agreement they had with their employees. Although there was testimony by Frances Sanders that they had not been able to locate any agreements since Stine left their employment, there was no evidence whatsoever to indicate that Davis or Stine was responsible for the misplacement of any employee records. Although Cora Maglero was observed by the Sanderses' housekeeper to be making a large number of copies on her computer and removing those copies to her car, there was no evidence suggesting that the employees' agreements were on the computer or that any of the company's employee records were taken by Cora Maglero.

## (3) Romantic Involvement

Without any evidence to support it, the majority concludes that Davis and Stine became romantically involved during the period that Davis was looking into the possibility of buying the Sanderses' business, and that they did not inform the Sanderses. The uncontradicted evidence of when Davis and Stine became romantically involved came from Davis himself, who testified that he and Stine started dating in January 1995, two months after Davis's alleged offer to buy the Sanderses' business. There is no evidence in the record to contradict Davis on this point. Furthermore, even if the romance had begun earlier, as the majority concludes, I do not see how the failure to disclose the fact of a romance is in any way relevant to prove any of the elements constituting the tort of deceit. No evidence was presented as to anything the Sanderses would have done differently had they known of the romance. No evidence was presented as to what effect the romance had on Davis's decision to buy or not to buy the business. In short, the existence of a romance between Davis and

Stine was nothing more than a red herring giving rise to speculation, unsupported by any evidence, that, because of their romance, they must have conspired to deceive the Sanderses.

### (4) Offer to Buy the Business

The majority says that the jury was justified in believing that Davis agreed to buy the business for $120,000. I disagree.[1]

The only evidence that Davis made an offer to buy the business for any amount came from the mouth of Bucky Sanders. On the other hand, the evidence that Davis made no offer was overwhelming: (1) After the November 4 meeting at which Sanders claimed the agreement was made, Sanders told no one but his wife, Frances; (2) Daughter-in-law Karen Sanders was not told about the agreement even though she owned one-third of the company and was present at the Sanderses' home (where the office is also located) on the day of the alleged agreement; (3) No effort was made to reduce the terms of the agreement to writing, notwithstanding that Sanderses' lawyer (who was also his niece's husband) had been actively involved in their efforts to sell the business; (4) No earnest money was tendered, nor was there any other act or conduct on the part of either party giving rise to an inference that an agreement had been reached; (5) Davis could not legally purchase the business because he did not have an Arkansas investigator's license and had not resided in Arkansas for two years.

There was no evidence of any motive that Davis would have had to deceive Sanders by telling him that he intended to buy the business when he did not intend to do so. There was no evidence of the existence of any other prospective purchasers of the business besides Davis. That there were no other prospects is corroborated by the testimony of the Sanderses' lawyer, Marc Honey, who testified that Davis's purchase of the business was the Sanderses' last

---

[1] While I agree with the general principle espoused by the majority that the credibility of witnesses and the weight to be given to their testimony are matters for determination by the jury, I do not agree that that principle insulates the appellate court from its obligation, where the appellants have raised the issue, to review the trial court's determination as to whether the evidence was sufficient to submit the issue to the jury in the first place.

opportunity to avoid bankruptcy, and that when Davis did not buy it, the Sanderses were left with no other alternative but to file for bankruptcy.

### (5) Enforceability of the Contract

While it is true, as the majority says, that the jury was entitled to believe the Sanderses' testimony, this case should never have gotten to the jury for two reasons: (a) the alleged oral contract, being in violation of the Statute of Frauds, was unenforceable; and (b) the alleged promise of purchase, being merely a promise of future conduct, may not form the basis of a fraud claim.

(a) Statute of Frauds

In its effort to avoid the consequence of the statute of frauds, the majority decides that it is the "better rule . . . that the statute of frauds does not abrogate the common-law remedy for fraud merely because the fraudulent misrepresentation was not in writing." I might agree that this is the better rule where it is undisputed that the representation was, in fact, a fraudulent one. However, this so called "better rule" should not be used in a deceit action as a vehicle to avoid the necessity of proving of the elements of deceit. Under the theory of the majority opinion, an alleged promisor could be held to have falsely promised by virtue of the fact that he did not do what he denies that he ever promised to do. By this circuitous reasoning, the majority holds that, in determining whether Davis made a knowingly false representation to buy Sanders's business, the jury is permitted to infer that Davis's promise was false from the fact that Davis did not buy the business. Consequently, Davis and Stine are compelled to pay damages because Davis did not buy a business that he could not have been legally compelled to buy in the first place.

The majority cites *Betnar v. Rose*, 259 Ark. 820, 536 S.W.2d 719 (1976), and *Bolin v. Drainage District No. 17*, 206 Ark. 459, 176 S.W.2d 459 (1943), in support of the proposition that the statute of frauds will not be permitted to be used as an instrument of fraud. Those cases, however, are clearly distinguishable from the

case at bar. Neither of those cases involved a cause of action for fraud or deceit. In *Betnar v. Rose, supra,* the plaintiff had made a $2,000 down payment on a house pursuant to an oral promise by its owner, the defendant, to sell it. Being an agreement to convey real property, it was clearly within the statute of frauds. The plaintiff decided not to buy the house and sued to get his $2,000 down payment back, contending that the contract was unenforceable under the statute of frauds. The supreme court disagreed, holding that one who pays money in consideration of an oral contract cannot rescind the contract and recover the money unless the other party insists on the statute of frauds and refuses to perform the contract on his part. In *Bolin v. Drainage District No. 17, supra,* a tenant took possession of real property pursuant to an oral agreement and remained in possession for more than a year without paying rent. When the landlord sought to dispossess the tenant and recover the unpaid rent, the tenant contended that he did not have to vacate the premises or pay the rent because the statute of frauds prevented enforcement of a contract for the lease of lands for more than a year. The supreme court disagreed, holding that the statute of frauds was not intended, and could not be used, to permit one to enter upon the lands of another, as a tenant, and after occupying it for more than a year, claim that he could not be dispossessed or required to pay rent because of the statute of frauds.

In the case at bar, if Davis had paid any money to the Sanderses in partial payment for Sanders's security business, I would agree that the principles announced in *Betnar* and *Bolin, supra,* would prevent him from relying on the statute of frauds as the basis of an action for the recovery of his down payment. However, I do not agree that *Betnar* and *Bolin* render the otherwise unenforceable contract enforceable by Sanders merely because Davis did not do what Sanders said that he promised to do. That is exactly the type of agreement intended to be avoided by the statute of frauds.

(b) Promise of Future Conduct

In citing the cases of *Golden Tee, Inc. v. Venture Golf Schools, Inc.,* 333 Ark. 253, 969 S.W.2d 625 (1998), and *Undem v. First*

*National Bank*, 46 Ark. App. 158, 879 S.W.2d 451 (1994), the majority recognizes the law in Arkansas to be that a promise of future conduct cannot form the basis for a claim of fraud or deceit unless it is shown that the party making the false promise knew at the time that it would not be kept. Even accepting as true the testimony of Bucky Sanders that Davis agreed to buy his business for $120,000, there is simply no evidence that Davis made that promise knowing that he did not intend to keep it. What possible motive could Davis have had to promise Sanders that he was going to do something that there was absolutely no reason for him to do? As I have already pointed out, there was no evidence of other prospective purchasers standing in line to buy the business. There was no evidence of anything that Davis and Stine had to gain by offering the Sanderses any amount of money for their business.

The majority suggests that an inference of Davis's intent not to perform could be drawn from the evidence that: (a) Davis agreed on November 4 to buy the business; (b) without notifying the Sanderses, he formed a rival business on November 9; and (c) the Sanderses' business records were wrongly taken and destroyed to further the formation of the rival business and hinder the Sanderses from taking timely remedial measures. As to the majority's point (a), I will not further lengthen this opinion except to again point out the complete lack of logic of inferring from an alleged promisor's failure to perform an act that he says he did not promise, that he did not intend to perform the act. As to point (b), it is just as illogical to infer that Davis made a promise knowing that he did not intend to perform it, from the fact that he did not *notify* the Sanderses that he would not perform the act that he maintains he never promised to perform. Furthermore, there was no evidence of any advantage gained by Davis during the five days between the date of the alleged promise on November 4 and Davis's formation of a new security business on November 9. What was there about the formation of a new business that could not have been done had Davis not promised to buy the Sanderses' business five days earlier? As to the majority's point (c), as already discussed, there was no evidence offered that either Davis or Stine took or destroyed any of Sanders's records; nor was there any evidence of how the displacement of those records prevented the

enforcement by Sanders of any corrective measures. There was, however, abundant evidence that if Sanders did not quickly sell his business to someone, it would be out of business by the end of the year; and that is exactly what happened.

For the reasons stated above, I would reverse and dismiss this case.