# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2602/09-2692

_____

| | | |
|---|---|---|
| Curtis Lumber Company, Inc., doing business as Caldwell Lumber Company, | * * * | |
| Plaintiff-Appellant/ Cross-Appellee, | * * | |
| v. | * * * | Appeals from the United States District Court for the Eastern District of Arkansas. |
| Louisiana Pacific Corporation, | * * | |
| Defendant-Appellee/ Cross-Appellant. | * * | |

_____

Submitted: June 16, 2010
Filed: August 24, 2010

_____

Before MELLOY, HANSEN, and SMITH, Circuit Judges.

_____

MELLOY, Circuit Judge.

Louisiana Pacific Corporation ("LP") is a national manufacturer of building materials. This case involves a rebate promotion that LP offered to builders and contractors who purchased a certain amount of LP's siding products. Curtis Lumber Company, Inc. ("Curtis Lumber"), a retail supplier of building materials, presented LP's rebate promotion to many of its customers. Eighty-two of those customers purchased or ordered LP's siding products with the expectation that LP would pay rebates worth up to $2,400. After the customers submitted rebate applications, LP

demanded that the customers also submit proof that the siding products had been installed. That requirement surprised a large majority of the customers, many of whom cancelled orders with Curtis Lumber, refused to pay Curtis Lumber, or demanded a rebate from Curtis Lumber. In the end, Curtis Lumber allegedly lost over $100,000 as a result of LP's acts, but none of Curtis Lumber's customers suffered out-of-pocket expenses. Curtis Lumber brought this diversity action against LP. The district court granted summary judgment to LP on all of Curtis Lumber's claims, from which Curtis Lumber now appeals. LP asserts a conditional cross-appeal, claiming that Curtis Lumber lacks standing and is not the real party in interest for this dispute. We affirm in part and reverse in part.

## I.     Background

In late 2006 or early 2007, LP announced a rebate promotion for a line of siding products called SmartSide. The purpose of the promotion was to encourage builders and contractors to install SmartSide products. LP offered rebates for several types of siding products—trim ($500), soffit ($300), lap ($800), and panel ($800)—for a maximum rebate of $2,400. The rebate promotion applied to orders received and acknowledged between January 15, 2007 and May 18, 2007.

LP relied on wholesalers and retailers to market the rebate promotion, and for guidance, it distributed an information sheet listing the promotion's details. The information sheet listed two qualifications: (1) "This promotion is open to new Builders or Contractors who purchase at least one house worth of SmartSide products," and (2) "Builder/Contractor will receive checks based upon purchases." In addition, the information sheet stated that LP required invoice documentation for a rebate to be paid. LP also distributed an application for builders and contractors to complete and submit. Under the heading "Terms and Conditions," the rebate application stated: "Please indicate products used and expected rebate, with a $2,400

-2-

maximum." Following this instruction was a chart for an applicant to write in how much of each category of siding product he or she ordered.

Upon learning of the rebate promotion, Curtis Lumber solicited orders from its customers who were builders and contractors. By the promotion's deadline, Curtis Lumber sold SmartSide products to eighty-two of its customers with the expectation that LP would pay a rebate worth up to $2,400 to each customer. Most of the orders were close to $2,400, so the customers expected to receive the SmartSide products with little or no out-of-pocket cost. Curtis Lumber placed orders with LP's wholesale distributor, Boise Cascade, to fulfill its customers' orders. Curtis Lumber also helped most of the customers complete rebate applications and submit them to LP along with the required invoices. Curtis Lumber expected to make roughly $600 in profit on each $2,400 purchase of SmartSide products.

LP was suspicious of the rebate applications from Curtis Lumber's customers because they were submitted in batches, written in the same handwriting, and were at or near the minimum purchase amount for the maximum rebate. LP was also concerned because the applications were submitted with sequentially numbered invoices that did not indicate purchases of other building materials. These characteristics were unusual among the nearly 1,000 rebate applications LP received from builders and contractors across the country. Therefore, on June 25, 2007, LP sent a letter to all of the rebate applicants who purchased SmartSide products from Curtis Lumber, requesting the following information in order to process their rebates: (1) a picture of the home showing SmartSide products, (2) the street address of the newly sided home, and (3) responses to a short questionnaire. If a rebate applicant did not submit proof of use, then LP would not pay a rebate.[1]

_____

[1]It appears that, with one exception, LP did not send the June 25 letter or a similar letter to rebate applicants who purchased SmartSide products from other retailers.

Upon receiving LP's letter, rebate applicants complained to Curtis Lumber. A majority of the applicants purchased SmartSide products for future use and therefore had not yet installed the products. Curtis Lumber told the complaining customers not to respond to the June 25 letter since it believed LP should pay the rebates instead of imposing an additional requirement for the rebate promotion. On July 6, 2007, Curtis Lumber's counsel sent an email to LP, detailing the customers' complaints, requesting LP to process the rebates, and threatening to sue LP if it did not pay rebates to the customers.

In the end, only nine of Curtis Lumber's customers responded to the June 25 letter with proof of use. LP paid rebates to those nine customers along with one other customer who did not respond (Habitat For Humanity). The remaining seventy-two rebate applicants either cancelled their orders with Curtis Lumber, demanded a rebate from Curtis Lumber, or refused to pay invoices sent by Curtis Lumber. Curtis Lumber complied with its customers' requests. Forty-one orders of SmartSide products were cancelled prior to delivery. Curtis Lumber paid rebates to seventeen customers, "out of concern for losing [the customers'] other business and as a result of having presented this program to them." Curtis Lumber was unable to collect the amount due on fourteen of the SmartSide sales. None of Curtis Lumber's customers incurred any out-of-pocket costs for which they were not reimbursed, and no customer has filed suit in connection with the SmartSide rebate promotion.

In April 2008, Curtis Lumber sued LP in Arkansas state court, asserting four causes of action: (1) breach of the Arkansas Deceptive Trade Practices Act ("ADTPA"), (2) negligent misrepresentation/constructive fraud, (3) equitable estoppel, and (4) intentional misrepresentation/fraud. Curtis Lumber alleged that LP's acts caused it to suffer just over $100,000 in damages, including lost profits from the cancelled sales, costs associated with carrying a large inventory of SmartSide products, the value of sales that Curtis Lumber was unable to collect, and costs of

rebates paid to customers. Further, Curtis Lumber requested that LP pay attorneys' fees and punitive damages.

LP removed this case to federal court and moved for summary judgment on three grounds: (1) Curtis Lumber lacked standing and was not the real party in interest, (2) Curtis Lumber's claims were meritless, and (3) Arkansas law precludes the alleged damages. The district court rejected LP's threshold challenges but granted partial summary judgment, finding that the negligent misrepresentation/constructive fraud claim failed on the merits. The remainder of Curtis Lumber's claims survived because questions of material fact remained as to Curtis Lumber's fraud and ADTPA claims—specifically, whether LP's omission of a "proof of use" requirement in the rebate documents was a material omission, whether the omission was intentional, and whether it caused Curtis Lumber's damages. Also, the court held that Curtis Lumber could amend its complaint to allege promissory estoppel and two additional claims under the ADTPA. However, the court limited the available damages, concluding that Arkansas's voluntary payment rule prohibited Curtis Lumber from seeking the value of rebates or refunds paid to customers, and that the evidence was insufficient to support a punitive damages award.

LP then moved for reconsideration, contending that the district court overlooked the terms "products *used*" in the rebate application. During a teleconference, the court acknowledged that it had given Curtis Lumber the benefit of a favorable inference on that question. Nonetheless, the court granted LP's motion for reconsideration, concluding that LP included a "use" requirement in its rebate program documents. As such, the court dismissed the remainder of Curtis Lumber's claims and also held that the voluntary payment rule precludes recovery of lost profits. Curtis Lumber appeals the dismissal of all of its claims and the district court's limitations on damages. LP conditionally cross-appeals the district court's determinations that Curtis Lumber has standing and is the real party in interest. Our discussion begins with LP's threshold challenges and then addresses the merits of Curtis Lumber's claims and the available damages.

## II. Analysis

### A. Standing

"Standing is a threshold inquiry and jurisdictional prerequisite that must be resolved before reaching the merits of a suit." Medalie v. Bayer Corp., 510 F.3d 828, 829 (8th Cir. 2007) (internal quotations omitted). Standing requires (1) an injury in fact (2) fairly traceable to the defendant's actions and (3) likely to be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992). LP argues that although Curtis Lumber's customers were potentially injured, Curtis Lumber does not have standing because it voluntarily paid rebates and refunds to its customers. Accordingly, Curtis Lumber's alleged injuries are not fairly traceable to LP's acts.[2] The district court concluded that Curtis Lumber has shown that it sustained damages based upon LP's actions. Reviewing *de novo*, see Hodak v. City of St.

---

[2]Curtis Lumber's reply brief groups the arguments on standing and the real-party-in-interest rule, and LP contends that Curtis Lumber therefore waived the standing issue. However, LP's arguments on these two issues are virtually the same. Indeed, the district court appears to have adjudicated the standing issue along with the real-part-in-interest issue, even though they are "distinct concepts." Mitchell Food Prods., Inc. v. United States, 43 F. App'x 369, 369 (Fed. Cir. 2002) (unpublished). We believe it was implicit in the district court's order that Curtis Lumber has standing to pursue this lawsuit. See United States v. Taylor, 544 F.2d 347, 349 (8th Cir. 1976) ("[T]he court in examining an order appealed from can look behind the label placed by the lower court on its order to determine the substance and effect of the order."). Given that the district court's order blended these issues and that the arguments are closely intertwined, we decline to hold that Curtis Lumber waived the standing issue. This case is a far cry from the case LP cites, Heerman v. Burke, 266 F.2d 935 (8th Cir. 1959), where this Court held that an appellee was precluded from asserting on rehearing a procedural challenge as to error preservation because it took issue only with the merits of the appeal in the original hearing. Id. at 940. In any event, standing is a threshold issue that we are obligated to scrutinize. Roberts v. Wamser, 883 F.2d 617, 620 (8th Cir. 1989).

<u>Peters</u>, 535 F.3d 899, 903 (8th Cir. 2008), <u>cert. denied</u>, 129 S. Ct. 1352 (2009), we conclude that Curtis Lumber has standing to bring this lawsuit.

Curtis Lumber has alleged distinct injuries that would not have occurred had LP paid rebates owed to the customers. Specifically, Curtis Lumber alleges that it lost the expected profits on the cancelled sales of SmartSide products and that it paid costs related to carrying the large inventory it ordered in reliance on the rebate promotion. These injuries are actual, particularized to Curtis Lumber, traceable to LP's acts, and redressable by a verdict in Curtis Lumber's favor. As such, the standing requirements are satisfied. <u>See</u> <u>Lujan</u>, 504 U.S. at 560–61. We decline LP's invitation to use the principle of constitutional standing to enforce Arkansas's voluntary payment rule. Whether Curtis Lumber can recover the rebates it paid to customers is a question better left to the applicable substantive law. <u>See</u> <u>infra</u> Section II-D-(2).

### B.     Real Party in Interest

Federal Rule of Civil Procedure 17(a) provides that every "action must be prosecuted in the name of the real party in interest." The function of this rule "is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata." Fed. R. Civ. P. 17(a) advisory committee note (1966). Accordingly, Rule 17(a) requires that the plaintiff "actually possess, under the substantive law, the right sought to be enforced." <u>United HealthCare Corp. v. Am. Trade Ins. Co., Ltd.</u>, 88 F.3d 563, 569 (8th Cir. 1996). This inquiry presents legal issues, <u>see</u> <u>In re Isbell Records, Inc.</u>, 586 F.3d 334, 336–37 (5th Cir. 2009), which we review *de novo*, <u>see</u> <u>Manion v. Nagin</u>, 392 F.3d 294, 300 (8th Cir. 2004).

LP contends that the rebate applicants are the real parties in interest, not Curtis Lumber. Curtis Lumber is merely seeking to recover on the customers' claims, LP argues, and thus the real-party-in-interest rule is necessary to protect LP from double liability. The district court rejected LP's argument, concluding that Curtis Lumber set

forth causes of action based on damages allegedly sustained by itself, not the rebate applicants. We conclude that Rule 17(a) does not bar Curtis Lumber's lawsuit. Curtis Lumber has alleged injuries that the customers could not allege—e.g., lost profits on the cancelled sales and the costs associated with unsold inventory. Conceivably, the rebate applicants could have asserted a breach-of-contract claim against LP after it refused to pay rebates. However, it is undisputed that none of those applicants suffered an injury, and therefore, there is no risk of duplicative litigation. As such, Curtis Lumber is the real party in interest.

## C.    Curtis Lumber's Claims

We now turn to whether the district court erred in granting LP's motion for summary judgment as to Curtis Lumber's four causes of action. "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Landon v. Nw. Airlines, Inc., 72 F.3d 620, 624 (8th Cir. 1995). Like the district court, we give the nonmoving party, Curtis Lumber, the benefit of all reasonable inferences from the evidence in the record. Kukla v. Hulm, 310 F.3d 1046, 1047–48 (8th Cir. 2002). Our standard of review is *de novo*, and we may affirm summary judgment on any basis supported by the record. In re Baycol Prods. Litig., 596 F.3d 884, 888 (8th Cir. 2010).

Arkansas law applies in this case. We are bound by decisions of the Arkansas Supreme Court as to the meaning of Arkansas law. See Progressive N. Ins. Co. v. McDonough, 608 F.3d 388, 390 (8th Cir. 2010). "If the [Arkansas Supreme Court] has not decided an issue we must attempt to predict how the [Arkansas Supreme Court] would resolve the issue, with decisions of intermediate state courts being persuasive authority." Id. Where Arkansas law is undeveloped, we may also "look to 'relevant state precedent, analogous decisions, considered dicta, and any other reliable data' to determine how the Supreme Court of [Arkansas] would construe [Arkansas] law." In re W. Iowa Limestone, Inc., 538 F.3d 858, 866 (8th Cir. 2008) (citation omitted).

### 1.     Fraud

Under Arkansas law, fraud requires: "(1) a false representation of material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance." Goforth v. Smith, 991 S.W.2d 579, 586 (Ark. 1999). Fraud also extends to concealment of material information and non-disclosure of certain pertinent information. Farm Bureau Policy Holders & Members v. Farm Bureau Mut. Ins. Co. of Ark., Inc., 984 S.W.2d 6, 14 (Ark. 1998).

The central focus of this litigation has been whether LP actually misrepresented the terms of the rebate promotion. Based on the word "used" in the rebate application ("Please indicate products used and expected rebate . . ."), LP contends that the rebate application included an "obvious" requirement that the builder or contractor actually have installed the SmartSide products in order to receive a rebate. LP also argues that the word "trial" on the information sheet ("Purpose: Encourage Builders and Contractors to trial SmartSide products") implicitly indicated LP's intent that applicants install the products. We disagree with LP's argument for several reasons.

First, the information sheet that LP provided to wholesalers and retailers listed qualifications, limits, and documentation requirements for the rebate promotion. Yet, the information sheet never mentioned a requirement that the SmartSide products had to be installed by a certain date, much less that they had to be installed by the time that the rebate applications were submitted. LP could merely have added two words to the information sheet: "Qualifications: This promotion is open to new Builders or Contractors who purchase *and install* at least one house worth of SmartSide products." Instead, LP's interpretation is premised on the word "used," which appears in a small font in the middle the rebate application. Viewing the "whole context" of the rebate information sheet and application rather than "particular words and phrases," a person

could reasonably infer that LP misrepresented or omitted a material term of the rebate promotion.  Coleman v. Regions Bank, 216 S.W.3d 569, 574 (Ark. 2005).

Second, LP's interpretation of the rebate documents is untenable.  It is undisputed that some of Curtis Lumber's customers had not received SmartSide products by the time they submitted the rebate applications.  Without delivery of the SmartSide products, it would have been impossible for those customers to have "used" the SmartSide products.  Given the delay between ordering the products and distribution and delivery, LP's proffered interpretation of the rebate requirements is unreasonable.  Indeed, Ben Skoog, the LP employee in charge of the rebate program, testified that customers who ordered the products late in the promotional period would qualify for the rebate program if they installed the products "within a reasonable time."

Third, even if we credit LP's argument that prior use was required in order to qualify for the rebate promotion, the rebate documents did not say that applicants would have to submit *proof* of use (e.g., photos, address) in order to receive a rebate. For these reasons, we conclude there is a question of material fact as to whether LP's rebate documents misrepresented or omitted a material term of the rebate promotion.

Alternatively, LP argues that, even if the rebate documents misrepresented a material term, there is insufficient evidence that it knew about the misrepresentation. In order to prove fraud, Curtis Lumber must demonstrate scienter, i.e., that LP "made a material false statement knowing that it was false at the time made."  McAnally v. Gildersleeve, 16 F.3d 1493, 1497 (8th Cir. 1994); see also South County, Inc. v. First W. Loan Co., 871 S.W.2d 325, 326 (Ark. 1994) ("Proof of a mere naked falsehood or representation is not enough even though the complaining party relied on it and sustained damages, but, in addition thereto, the false statement must have been knowingly or intentionally made.") (quotation omitted).  To satisfy this element, Curtis Lumber is not required to put forth "direct evidence or positive testimony" of fraud.  Receivables Purchasing Co., Inc. v. Eng'g & Prof'l Servs., Inc., 510 F.3d 840,

844 (8th Cir. 2008). "'Circumstantial evidence can provide a basis for the jury to infer fraud where . . . the circumstances are inconsistent with honest intent.'" Id. (quoting Stine v. Sanders, 987 S.W.2d 289, 293 n.3 (Ark. Ct. App. 1999)). However, "the circumstances must be so strong and well connected as to clearly show fraud." Allred v. Demuth, 890 S.W.2d 578, 580 (Ark. 1994).

We agree that evidence of scienter is lacking in this case. Curtis Lumber has not identified any unusual or suspicious conduct or circumstances surrounding LP's statements from which we could reasonably infer a fraudulent state of mind. Cf. Interstate Freeway Servs., Inc. v. Houser, 835 S.W.2d 872, 874 (Ark. 1992) (holding that a jury could infer proof of fraud based on several circumstances surrounding the employment offer in question, including the short duration of the plaintiff's employment and the reasons and circumstances for the plaintiff's termination). Moreover, LP has consistently maintained its interpretation of the rebate promotion requirements, unlike situations where fraud can be inferred from a defendant's contradiction of the representation in question. See, e.g., Morrill v. Becton, Dickinson & Co., 747 F.2d 1217, 1222–23 (8th Cir. 1984) (holding that misrepresentations may be actionable fraud based in part on internal memoranda from the defendant company that contradicted the representations in question).

Curtis Lumber argues that LP's knowledge of a false statement can be inferred from Skoog's testimony that (1) LP intended retailers and customers to rely on the rebate program documents, (2) LP intended to include a proof-of-use requirement in the rebate program, and (3) that the rebate program documents are incomplete because they did not specify the requirement that rebate applicants must install the SmartSide products by a certain date. However, Skoog's testimony, even when it is construed in the light most favorable to Curtis Lumber, amounts merely to an admission *in hindsight* that the rebate documents were incomplete. The mere admission of a misstatement is not enough to presume a fraudulent state of mind. See Houser, 835 S.W.2d at 873 ("Fraud is never presumed, and must be affirmatively proved . . . ."). At most, Skoog's testimony supports an inference that the omission in the rebate

documents was a product of an honest mistake, which is insufficient to prove fraud. See Morrill, 747 F.2d at 1222 (some of the defendant's misrepresentations could not be actionable fraud where the only evidence of scienter was testimony that the inaccuracies "were honest mistakes"). This testimony falls short of the elevated burden for proving fraud by circumstantial evidence.

Curtis Lumber also contends that scienter can be inferred from the fact that LP deviated from its procedures for processing rebate applications by sending the June 25 letter demanding proof of use. Even if we assume that the June 25 letter was a deviation from LP's procedures, we fail to see how this fact assists Curtis Lumber's case. If anything, the fact that LP established procedures for processing rebate applications, and that it followed those procedures in nearly all other instances, shows that there was no fraudulent scheme at work.

In sum, Curtis Lumber has not presented evidence to shed light on LP's state of mind *when it issued the rebate documents*. As such, no reasonable fact-finder could conclude that LP falsely represented the terms of the rebate promotion with knowledge of such falsity. Accordingly, summary judgment was appropriate as to Curtis Lumber's fraud claim. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

## 2. **Constructive Fraud**[3]

Constructive fraud is doctrine of "limited reach" that Arkansas courts have used to broaden tort liability. Receivables Purchasing, 510 F.3d at 843. As explained in the previous section, traditional fraud requires an intent to deceive and knowledge that a material misrepresentation is false. Constructive fraud, by comparison, does not require a deceptive intent or knowledge of falsity. Knight v. Day, 36 S.W.3d 300, 303 (Ark. 2001). "[T]he test for constructive fraud . . . has been defined as the making of misrepresentations by one who, not knowing whether they are true or not, asserts them to be true without knowledge of their falsity and without moral guilt or evil intent." South County, 871 S.W.2d at 327. Thus, a representation that is not fraudulent in the traditional sense may be construed as fraudulent "because of its tendency to deceive others." Knight, 36 S.W.3d at 303; see also Lane v. Rachel, 389 S.W.2d 621, 624 (Ark. 1965) ("[R]epresentations are construed to be fraudulent when made by one who either knows the assurances to be false or else not knowing the verity asserts them to be true.").[4]

---

[3]Curtis Lumber originally titled its second cause of action, "Negligent Misrepresentation." The district court correctly stated that Arkansas does not recognize a tort of negligent misrepresentation, see South County, 871 S.W.2d at 326, and then analyzed Curtis Lumber's claim under the doctrine of constructive fraud, which is a cognizable tort in Arkansas, id. at 327. Giving Curtis Lumber the benefit of the doubt, we also construe the second cause of action as a claim for constructive fraud.

[4]There is confusion within Arkansas law as to whether constructive fraud requires a particular type of relationship between the plaintiff and defendant. On one hand, Arkansas courts have said constructive fraud involves "a breach of a legal or equitable duty," e.g., Miskimins v. City Nat'l Bank of Fort Smith, 456 S.W.2d 673, 679 (Ark. 1970); Beatty v. Haggard, 184 S.W.3d 479, 485 (Ark. Ct. App. 2004), and that "[c]onstructive fraud can exist in cases of rescission of contracts or deeds and breaches of fiduciary duties," Farm Bureau, 984 S.W.2d at 14. We note, however, that the Arkansas courts have not expressly defined the types of relationships or transactions that may trigger constructive fraud. Additionally, the Arkansas Supreme Court has stated more recently that the existence of a fiduciary relationship is not

-13-

Curtis Lumber's complaint alleged that statements made by LP's wholesaler, Boise Cascade, were false. The district court correctly concluded that this allegation was without evidentiary support. Accordingly, summary judgment was proper to the extent Curtis Lumber's constructive fraud claim was based on alleged misrepresentations by Boise Cascade.

Curtis Lumber's argument on appeal, however, is that the district court ignored an aspect of its constructive fraud claim—that LP committed constructive fraud by misrepresenting the terms of the rebate promotion. Curtis Lumber contends that the constructive fraud claim should have survived summary judgment for the same reason that the fraud claim should have survived. In support, Curtis Lumber relies on the statements in Arkansas cases that constructive fraud has all of the elements of fraud without intent to deceive. E.g., Downum v. Downum, 274 S.W.3d 349, 352 (Ark. Ct. App. 2008).

We believe that Curtis Lumber misconstrues constructive fraud. The doctrine does not apply to all material misrepresentations regardless of the defendant's state of mind. If that were the case, then constructive fraud would encompass negligent misrepresentations as well, which is a result precluded by Arkansas law. See South County, 871 S.W.2d at 326. Rather, constructive fraud merely extends tort liability to *recklessly* false statements. See Receivables Purchasing, 510 F.3d at 843 ("[T]he Arkansas Supreme Court would hold that liability for fraud attaches in cases where a defendant lacked knowledge that his or her representation was false but did not know whether it was true or not."). As we stated in the previous section, the evidence in the record demonstrates that LP's misrepresentation was merely negligent or the result of an honest mistake. A jury could not reasonably find that LP's rebate

_____

always an essential element of constructive fraud. South County, 871 S.W.2d at 327. We assume that the relationship between LP and Curtis Lumber was within the general parameters of constructive fraud.

documents were recklessly false. Accordingly, summary judgment was appropriate as to the constructive fraud claim.

### 3. ADTPA

Curtis Lumber has alleged that LP's acts constitute deceptive trade practices or unlawful acts under the ADTPA in five ways.[5] First, LP knowingly made a false representation as to the characteristics and benefits of goods, in violation of Arkansas Code § 4-88-107(a)(1). Second, LP advertised goods with the intent not to sell them as advertised, in violation of Arkansas Code § 4-88-107(a)(3). Third, LP employed bait-and-switch advertising consisting of an attractive but insincere offer to sell a product that LP in truth did not intend or desire to sell, evidenced by the requirement of an undisclosed condition precedent to the purchase, in violation of Arkansas Code § 4-88-107(a)(5)(B). Fourth, LP's acts in business and commerce were unconscionable, false, and deceptive, in violation of Arkansas Code § 4-88-107(a)(10). Lastly, LP concealed or omitted a material fact in connection with the sale of goods with the intent that others rely upon the concealment or omission, in violation of Arkansas Code § 4-88-108(2).

The district court granted summary judgment on Curtis Lumber's ADTPA claims based on the finding that LP included a "use" requirement in the rebate application. We disagree. See supra p. 9–10. As with the fraud claim, however, our

[5]Curtis Lumber's complaint alleged only three ADTPA theories. In its first summary judgment order, the district court granted leave to amend the complaint to add the claims under Arkansas Code §§ 4-88-107(a)(5)(B) and 4-88-108. No amended complaint was filed, however, because the district court subsequently granted LP's motion for reconsideration and dismissed all of Curtis Lumber's claims. Although the latter two ADTPA claims have yet to be pleaded, LP does not contend that they are not properly before this Court. In any event, our analysis of the latter two ADTPA claims parallels our analysis of the original ADTPA claims, and thus, we take the opportunity to clarify which claims should survive summary judgment after a remand.

analysis continues to the state-of-mind requirements under the ADTPA. Although the district court did not reach this issue, we must address the state-of-mind element because it is a dispositive issue. If the ADTPA requires Curtis Lumber to prove knowing/intentional deception, then summary judgment should be affirmed just as with the fraud claim.

The state-of-mind requirements for claims under the ADTPA would be an issue of first impression for the Arkansas Supreme Court. To interpret the ADTPA, we adhere to Arkansas's canons of statutory interpretation:

> Where a term in a statute is clear and unambiguous, it will be given its ordinary meaning. Cash v. Ark. Comm'n on Pollution Control & Ecology, 778 S.W.2d 606, 607 (Ark. 1989). A statutory term is ambiguous when it is capable of two or more constructions, or when it is so unclear that reasonable minds could disagree or be uncertain as to its meaning. R.K. Enter., L.L.C. v. Pro-Comp Mgmt., Inc., 158 S.W.3d 685, 688 (Ark. 2004). When an ambiguity exists, the court will interpret the provision in a way consistent with the legislature's intent. Cent. & S. Cos. v. Weiss, 3 S.W.3d 294, 297 (Ark. 1999). That intent may be divined by looking "to the language of the statute, the subject matter, the object to be accomplished, the purpose to be served, the remedy provided, the legislative history, and other appropriate means that throw light on the subject." Saforo & Assocs., Inc. v. Porocel Corp., 991 S.W.2d 117, 124 (Ark. 1999).

Design Prof'ls Ins. Co. v. Chicago Ins. Co., 454 F.3d 906, 910 (8th Cir. 2006).

It is clear from the text of the ADTPA that Curtis Lumber's first three theories require that the defendant knowingly and intentionally engage in a deceptive trade practice. See Ark. Code § 4-88-107(a)(1) ("*Knowingly* making a false representation . . . .") (emphasis added); id. § 4-88-107(a)(3) ("Advertising the goods or services *with the intent not to sell them as advertised*") (emphasis added); id. § 4-88-107(a)(5) ("The employment of bait-and-switch advertising consisting of an attractive *but insincere offer* to sell a product or service which the seller in truth *does not intend or*

-16-

*desire to sell . . .*") (emphasis added); <u>see also</u> <u>Gen. Steel Domestic Sales, LLC v.</u> <u>Hogan & Hartson, LLP</u>, 230 P.3d 1275, 1281–83 (Colo. Ct. App. 2010) (holding that the bait-and-switch advertising prohibition in the Colorado Consumer Protection Act includes the element of an intent to deceive). In other words, the state-of-mind requirement for those three theories mirrors the state-of-mind requirement for traditional fraud. And since there is no genuine dispute of fact that LP knowingly misrepresented or omitted a term of the rebate promotion, summary judgment was appropriate on Curtis Lumber's first three ADTPA theories.

For several reasons, though, we conclude that claims pursuant to Arkansas Code §§ 4-88-107(a)(10) and 4-88-108(2) do not require knowing or intentional deception. First, neither provision on its face requires an intent to deceive or knowledge that a representation is false. The Arkansas legislature could easily have added the word "knowingly," "intentionally," or "willfully" to §§ 4-88-107(a)(10) and 4-88-108(2), just as it did under several portions of § 4-88-107(a).[6] Accordingly, the absence of one of these terms is evidence that the Arkansas legislature did not intend

---

[6]For example, the New Jersey Consumer Fraud Act prohibits *inter alia* "the *knowing*, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate." N.J. Stat. § 56:8-2 (emphasis added). Accordingly, New Jersey courts have concluded, "when the alleged consumer fraud consists of an omission, a plaintiff must show that the defendant acted with knowledge, thereby making intent an essential element of the fraud." <u>Vukovich v.</u> <u>Haifa, Inc.</u>, Civ. Action No. 03-737, 2007 WL 655597, at *9 (D.N.J. Feb. 27, 2007); <u>see also</u> <u>Cox v. Sears Roebuck & Co.</u>, 647 A.2d 454, 462 (N.J. 1994).

Similarly, the Kansas Consumer Protection Act prohibits "the *willful* concealment, suppression or omission of a material fact." Kan. Stat. Ann. § 50-626(b)(3) (emphasis added). Predictably, Kansas courts have held that mere nondisclosure of a material fact is insufficient to state a claim under the KCPA—a plaintiff must show a *willful* omission of a material fact. <u>See, e.g.</u>, <u>Porras v. Bell</u>, 857 P.2d 676, 678 (Kan. Ct. App. 1993); <u>Heller v. Martin</u>, 782 P.2d 1241, 1244 (Kan. Ct. App. 1989).

to limit §§ 4-88-107(a)(10) and 4-88-108(2) to intentional or knowing deception. Cf. Arkansas v. Owens, 260 S.W.3d 288, 291 (Ark. 2007) ("Had the legislature intended for the five years to run only from the initial order of conditional release it could have easily said so by including such language in the statute.").

Second, states with laws virtually identical to Arkansas Code § 4-88-108(2)[7] have overwhelmingly concluded that intent to deceive is not required under their analogous provisions. For example, the Illinois Consumer Fraud Act ("ICFA") prohibits "unfair or deceptive acts or practices, including but not limited to . . . the concealment, suppression or omission of such material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . ." 815 Ill. Comp. Stat. 505/2.[8] Illinois courts have stated that the seller's intent to deceive (or lack thereof) is immaterial for a claim under the ICFA because innocent misrepresentations are also actionable. See, e.g., Cripe v. Leiter, 703 N.E.2d 100, 103 (Ill. 1998); Duhl v. Nash Realty, Inc., 429 N.E.2d 1267, 1277 (Ill. App. Ct. 1981). Indeed, in a case where the plaintiffs brought

---

[7]Arkansas Code § 4-88-108 provides in its entirety:

When utilized in connection with the sale or advertisement of any goods, services, or charitable solicitation, the following shall be unlawful:
(1)  The act, use, or employment by any person of any deception, fraud, or false pretense; or
(2)  The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission.

[8]To be sure, the Illinois statute is distinguishable from Arkansas Code § 4-88-108(2) because it expressly states that neither actual deception nor injury is required. Moreover, the statute also instructs that courts should interpret the IFCA with consideration for "the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act." 815 Ill. Comp. Stat. 505/2. These differences, however, are immaterial as to the issue for which we believe the Illinois jurisprudence is persuasive—the requisite state of mind for a statutory violation.

an ICFA claim against an exterminating company based on the company's failure to disclose material facts in a termite inspection report, the Appellate Court expressly rejected the argument that the defendant could be held liable under the ICFA because it did not intend to deceive the plaintiffs:

> This . . . is no defense. Under the statute, state of mind is immaterial, and a defendant need not be motivated by an intent to deceive. . . . [A] violator's good or bad faith is not important. Even innocent misrepresentations may be actionable. By its own terms, the statute requires only that a violator intend for a purchaser to *rely* on his acts or omissions. A party is considered to intend the necessary consequences of his own acts or conduct.

Warren v. LeMay, 491 N.E.2d 464, 474 (Ill. App. Ct. 1986) (internal citations omitted). Accordingly, the court held that the defendant's mere submission of the termite inspection report "evinces the requisite intent" under the ICFA because the "sole purpose for the requested report . . . was to assist plaintiffs in securing VA financing." Id. Similar persuasive evidence exists in judicial interpretations of materially indistinguishable consumer protection laws in Arizona,[9] Delaware,[10] Iowa,[11]

---

[9]See Ariz. Rev. Stat. Ann. § 44-1522(A); Flagstaff Med. Ctr., Inc. v. Sullivan, 773 F. Supp. 1325, 1661–62 (D. Ariz. 1991), rev'd in part on other grounds, 962 F.2d 879 (9th Cir. 1992) ("It is not necessary to show specific intent to deceive; the intent to do the act involved is sufficient."); Arizona ex rel. Babbitt v. Goodyear Tire & Rubber Co., 626 P.2d 1115, 1118 (Ariz. Ct. App. 1981) (same).

[10]See Del. Code Ann. tit. 6, § 2513(a); Nash v. Hoopes, 332 A.2d 411, 413 (Del. Super. Ct. 1975) ("The only reference to 'intent' in this section is that the outlawed action be done 'with intent that others rely upon such concealment, suppression or omission . . .'. Fraudulent intent in connection with the making of such unlawful practice is not requisite to the availability of the remedies of the statute.").

[11]See Iowa Code § 714.16(2)(a); Iowa ex rel. Miller v. Pace, 677 N.W.2d 761, 771 (Iowa 2004) ("[I]t is not necessary . . . to prove that the violator acted with an intent to deceive, as is required for common law fraud. . . . [T]he only intent required by the statute is that the defendant act 'with the intent *that others rely*' upon his

-19-

Minnesota,[12] and Missouri.[13] We see no basis for concluding that Arkansas courts would interpret Arkansas Code § 4-88-108(2) differently with regard to the state-of-mind requirement.

Third, the Arkansas legislature intended to proscribe more than traditional fraud when used it the term "deceptive act or practice" in the ADTPA's catch-all provision. See Ark. Code § 4-88-107(a)(10) (proscribing "any other unconscionable, false, or deceptive act or practice in business, commerce, or trade"). Because, "deceptive act or practice" is not defined in any Arkansas statute, regulation, or opinion, we look elsewhere. Arkansas is one of many states that enacted a deceptive and unfair trade

omissions.") (internal citations omitted).

[12]See Minn. Stat. § 325F.69, subdiv. 1; McNamara v. Nomeco Bldg. Specialties, Inc., 26 F. Supp. 2d 1168, 1171 (D. Minn. 1998) ("Simply stated, one making representations in the sale of consumer goods can be held liable, even though he had no specific intent to falsely mislead the consumer.").

[13]See Mo. Rev. Stat. § 407.020, subdiv. 1; Missouri ex rel. Webster v. Areaco Inv. Co., 756 S.W.2d 633, 635 (Mo. Ct. App. 1988) ("It is the defendant's conduct, not his intent, which determines whether a violation has occurred."); Missouri ex rel. Ashcroft v. Mktg. Unlimited of Am., Inc., 613 S.W.2d 440, 445 (Mo. Ct. App. 1981) (same).

The Alaska Consumer Fraud Act and the West Virginia Consumer Credit and Protection Act ("WVCCPA") also contain state-of-mind standards virtually identical to Arkansas Code § 4-88-108(2). See Alaska Stat. § 45.50.471(b)(12); W. Va. Code § 46A-6-102(7)(M). However, our research reveals no cases in which a court has analyzed those statutes with regard to the state-of-mind requirement. Admittedly, the Fourth Circuit has stated that plaintiffs must satisfy the standard requirements for fraud in order to invoke the WVCCPA. Jones v. Sears Roebuck & Co., 301 F. App'x 276, 287 (4th Cir. 2008) (unpublished per curiam). However, that opinion neither analyzes the language of the WVCCPA nor cites any case law to support the proposition that the WVCCPA requires a fraudulent intent. As such, we respectfully find the opinion to be of little guidance in predicting how the Arkansas Supreme Court would interpret the ADTPA.

practices act, or a "little FTC act," in the 1960s or 1970s. The majority of states with such laws do not require knowing or intentional deception in order to state an actionable claim under their respective acts. See Carolyn L. Carter & Jonathan Sheldon, Unfair and Deceptive Acts and Practices, § 4.2.4.1, at 193–95 (7th ed. 2009) (collecting authorities); Donald M. Zupanec, Annotation, Practices Forbidden by State Deceptive Trade Practice and Consumer Protection Acts, 89 A.L.R.3d 449, at § 4 (1979); see also Wallis v. Ford Motor Co., 208 S.W.3d 153, 161–62 (Ark. 2005) (surveying other states' consumer-protection statutes to interpret the ADTPA). Those states' interpretations of deceptive trade practices are further buttressed by many federal court opinions holding that a defendant's good faith is immaterial to whether a "deceptive act" has occurred under § 5 of the Federal Trade Commission Act because that statute does not require an intent to deceive.[14] Along the lines of the Federal Trade Commission's definition of deception, many courts have defined trade practices as deceptive if they are likely to deceive or have a capacity to deceive a reasonable consumer. See Black's Law Dictionary 435 (8th ed. 2004) (defining "deceptive act": "As defined by the [FTC] and most state statutes, conduct that is likely to deceive a consumer acting reasonably under similar circumstances.").[15]

---

[14]See, e.g., F.T.C. v. Verity Int'l, Ltd., 443 F.3d 48, 63 (2d Cir. 2006); F.T.C. v. Bay Area Bus. Council, Inc., 423 F.3d 627, 635 (7th Cir. 2005); F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d 1192, 1204 n.7 (10th Cir. 2005); Removatron Int'l Corp. v. F.T.C., 884 F.2d 1489, 1495 (1st Cir. 1989); Orkin Exterminating Co. v. F.T.C., 849 F.2d 1354, 1368 (11th Cir. 1988); Chrysler Corp. v. F.T.C., 561 F.2d 357, 363 n.5 (D.C. Cir. 1977); Beneficial Corp. v. F.T.C., 542 F.2d 611, 617 (3d Cir. 1976); Doherty, Clifford, Steers & Shenfield, Inc. v. F.T.C., 392 F.2d 921, 925 (6th Cir. 1968); Feil v. F.T.C., 285 F.2d 879, 896 (9th Cir. 1960); see also United States v. Johnson, 541 F.2d 710, 712 (8th Cir. 1976) ("[L]iability for civil penalties [under the FTCA] arises without a need for any showing that the practices were intentional or malicious."); Benrus Watch Co. v. F.T.C., 352 F.2d 313, 318 (8th Cir. 1965) ("Whether a trade practice . . . is deceptive depends . . . on the impression which such a practice makes on the minds of the consuming public.").

[15]See, e.g., In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 185 (1st Cir. 2009) (interpreting the Massachusetts consumer protection statute); Doe

In addition, Arkansas Code § 4-88-108(1) lists both fraud and deception as unlawful acts. These terms cannot be coterminous, as that result would violate the basic principle that a statute must be construed so that every word is given meaning and effect, if possible, "so that no word is left void, superfluous or insignificant." Rose v. Ark. State Plant Bd., 213 S.W.3d 607, 614 (Ark. 2005).

Finally, our interpretation of the ADTPA is influenced by the fact that the preamble to the ADTPA provides that the statute was enacted "to protect the interests of both the consumer public and the legitimate business community." Mosby v. Int'l Paper Co., No. 5:07CV00314-WRW, 2008 WL 2669148, at *2 (E.D. Ark. July 1, 2008) (unpublished) (quoting the ADTPA preamble). Furthermore, the Arkansas Supreme Court has recognized "the legislature's remedial purpose" in enacting the ADTPA and also that a "liberal construction of the [A]DTPA is appropriate." Arkansas ex rel. Bryant v. R & A Inv. Co., 985 S.W.2d 299, 302 (Ark. 1999). Liberal construction in this context means that the ADTPA should protect consumers from trade practices beyond common law fraud.

In light of these considerations, we conclude that summary judgment was inappropriate as to Curtis Lumber's claims under §§ 4-88-107(a)(1) and 4-88-108(2). A reasonable fact-finder could conclude that LP omitted a material term from the rebate documents with the intent that retailers and customers rely on the rebate documents—and likewise that LP's rebate documents constituted a deceptive trade practice. But unlike the fraud and constructive fraud claims, the ADTPA claims are

_____

v. SexSearch.com, 551 F.3d 412, 418 (6th Cir. 2008) (Ohio); Zlotnick v. Premier Sales Group, Inc., 480 F.3d 1281, 1284 (11th Cir. 2007) (Florida); Bober v. Glaxo Wellcome PLC, 246 F.3d 934, 938–39 (7th Cir. 2001) (Illinois); cf. Doe v. Boys Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 479–80 (Tex. 1995) ("Generally, an act is false, misleading, or deceptive if it has the capacity to deceive an 'ignorant, unthinking, or credulous person.'") (citation omitted). But see Missouri ex rel. Nixon v. Telco Directory Pub., 863 S.W.2d 596, 601–602 & n.2 (Mo. 1993) (listing cases from twenty-one states adopting the "capacity to deceive" standard but holding that, under Missouri's act, deception is a species of fraud).

viable despite the lack of evidence regarding LP's knowledge of a false or deceptive practice or it's specific intent to deceive.

### 4. Promissory Estoppel[16]

Under Arkansas law, promissory estoppel requires that the plaintiff clearly show four elements: "(1) the making of a promise, (2) intent by the promisor that the promise be relied upon, (3) reliance upon the promise by the promisee, and (4) injustice resulting from a refusal to enforce the promise." In re Hilyard Drilling Co., 840 F.2d 596, 602 (8th Cir. 1988); see also K.C. Props. of N.W. Ark., Inc. v. Lowell Inv. Partners, LLC, 280 S.W.3d 1, 14 (Ark. 2008) ("[T]he party asserting estoppel must prove it strictly, there must be certainty to every intent, the facts constituting it must not be taken by argument or inference, and nothing can be supplied by intendment."). Curtis Lumber alleges that LP promised to pay rebates if customers met the qualifications on the rebate documents, LP intended retailers like Curtis Lumber and end-user customers to rely on the promise, Curtis Lumber detrimentally relied on LP's promise, and Curtis Lumber's injuries constitute an injustice. Notably, other courts have held that a plaintiff is not required to show that a defendant harbored a fraudulent intent in order to recover under the doctrine of promissory estoppel. See Harris v. Chicago Hous. Auth., No. 97 C 6285, 1998 WL 386371, at *3 n.2 (N.D. Ill. July 2, 1998) (unpublished) ("Defendant's contention that fraud or intent to deceive is a required element of a promissory estoppel claim is flatly incorrect.").

---

[16]Curtis Lumber originally alleged a claim for equitable estoppel. When the district court partially granted summary judgment, it also granted Curtis Lumber leave to amend the complaint to state a claim for promissory estoppel. That leave to amend became moot when the court later found that LP included a "use" term in the rebate documents. The parties argue on appeal whether a promissory estoppel claim should survive summary judgment, and we evaluate the claim accordingly.

LP contends that Curtis Lumber cannot prove the elements of promissory estoppel for two reasons. First, LP argues that it fulfilled the promises it made regarding the rebate program. However, we believe a reasonable fact-finder could disagree. LP promised to pay rebates to customers who purchased SmartSide products and, importantly, failed to state a condition to this payment that the customers use the products by a certain date or submit proof of their use to LP. See supra pp. 9–10. As such, LP's first argument fails.

LP's second argument is that relief under promissory estoppel is limited to "enforcement of the promise" between LP and the customers, and therefore Curtis Lumber cannot recover for the costs it incurred in reliance on LP's promise. The sole remedy, according to LP, is requiring LP to pay rebates to the customers. However, LP's argument is contrary to Section 90 of the Restatement (Second) of Contracts, which, in Arkansas, is the "black-letter law on promissory estoppel." K.C. Props., 280 S.W.3d at 14. Comment d to § 90 expressly contemplates a variety of available remedies:

> A promise binding under this section is a contract, and full-scale enforcement by normal remedies is often appropriate. But the same factors which bear on whether any relief should be granted also bear on the character and extent of the remedy. In particular, relief may sometimes be limited to restitution or to damages or *specific relief measured by the extent of the promisee's reliance rather than by the terms of the promise*.

Restatement (Second) of Contracts § 90, cmt. d (1981) (emphasis added). Moreover, the Restatement also contemplates claims brought by third parties who detrimentally rely on a promise. See id. § 90(1) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee *or a third person* and which does induce such action or forbearance . . . .") (emphasis added); see also id. § 90 cmt. c. (reliance by third parties). LP cites two Arkansas cases, Peoples National Bank v. Linebarger Construction Co., 240 S.W.2d 12 (Ark. 1951), and Country Corner Food & Drug, Inc. v. Reiss, 737 S.W.2d 672 (Ark. Ct. App. 1987),

-24-

for the position that the remedies under promissory estoppel are limited, but neither case is apposite. Therefore, we conclude that Arkansas law permits Curtis Lumber to recover damages it incurred in reliance on LP's promise under the doctrine of promissory estoppel.

### D.    Damages

Curtis Lumber seeks damages for lost profits on the sales of SmartSide products, increased costs associated with carrying extra inventory, the value of rebates that Curtis Lumber paid to its customers, the value of sales it was unable to collect due to LP's acts, injuries to goodwill, attorneys' fees, and punitive damages. LP argues that several of the damages claims are barred by law, but it does not appear to challenge the damages sought for inventory costs, goodwill, or attorneys' fees.

### (1)    Lost Profits

Arkansas has not decided whether lost profits are recoverable under promissory estoppel. See S. Beach Beverage Co. v. Harris Brands, Inc., 138 S.W.3d 102, 108 (Ark. 2003) (reserving this question). Lost profits are recoverable, however, under the ADTPA. See Ark. Code § 4-88-113(f) ("Any person who suffers actual damage or injury as a result of an offense or violation as defined in this [Act] has a cause of action to recover actual damages, if appropriate, and reasonable attorney's fees."); cf. Smith v. Walt Bennett Ford, Inc., 864 S.W.2d 817, 825 (Ark. 1993) ("[L]ost profits are recoverable under the [Federal Odometer Fraud] Act as 'actual damages' provided they are proved to the requisite levels of certainty and causation.").

The district court initially held that Curtis Lumber has presented enough evidence to recover damages for lost profits. In its order granting LP's motion for reconsideration, however, the court determined that the voluntary payment rule precludes Curtis Lumber from recovering lost profits. This result is incorrect. Although Curtis Lumber's payments to customers arguably were "voluntary," Curtis

Lumber's alleged lost profits were not. LP does not argue to the contrary. Accordingly, we hold that Curtis Lumber may pursue damages for lost profits on the cancelled sales.

### (2)    Rebates Paid by Curtis Lumber

This section concerns the rebates that Curtis Lumber paid, either in the form of a cash refund or an account credit, to seventeen of its customers after LP refused to pay the rebates. LP argues that Curtis Lumber cannot recover "any payments or account credits it gave to its customers," because Curtis Lumber voluntarily gave those payments and credits.[17] Under Arkansas's well-established voluntary payment rule, a person cannot recover money that he or she has voluntarily paid. See Boswell v. Gillett, 295 S.W.2d 758, 761 (Ark. 1956); see also TB of Blythesville, Inc. v. Little Rock Sign & Emblem, Inc., 946 S.W.2d 930, 932 (Ark. 1997). A payment is deemed voluntary, and thus not recoverable, "when a person without mistake of fact or fraud, duress, coercion, or extortion pays money on a demand which is not enforceable against him." Ritchie v. Bluff City Lumber Co., 110 S.W. 591, 592 (Ark. 1908). Curtis Lumber admits that it had no enforceable obligation to pay rebates to its customers. Instead, it argues that the fraud and duress exceptions to the voluntary payment rule apply, and therefore, payment of the rebates was not voluntary.

The fraud exception does not apply because, as we stated previously, Curtis Lumber has not shown a viable fraud claim. Moreover, even if Curtis Lumber could establish the requisite state of mind for fraud, it has not shown that it paid rebates to

---

[17]We do not interpret LP's argument to apply to the fourteen orders that Curtis Lumber was unable to collect allegedly due to LP's acts. Curtis Lumber did not pay those customers either in the form of a cash refund or an account credit. At most, Curtis Lumber failed to pursue legal action to collect the amounts owed. Even if we consider Curtis Lumber's inaction to be a "payment," we would find that there exists a factual question as to whether it was involuntary under the duress exception. See infra pp. 28–32.

customers *in reliance on* LP's allegedly fraudulent statement. Stated differently, LP's alleged fraud did not induce Curtis Lumber to pay rebates. At most, Curtis Lumber has shown *causation*—i.e., that LP's statements caused a situation in which it felt compelled to pay rebates to the customers. That is different, however, from the situation where a payor is fraudulently induced to make a payment, in which case the law treats the payment as involuntary. See 70 C.J.S. Payment § 120.

Curtis Lumber's duress argument is more compelling. The record shows that Curtis Lumber marketed LP's products and the rebate promotion to customers representing seventy-five percent of its business. After LP's June 2007 letter to the rebate applicants, Curtis Lumber's owner, who was relatively new to the business, stated that he was compelled to pay customers the rebates "[o]ut of concern for losing their other business and as a result of having presented this program to them." Indeed, two of Curtis Lumber's customers stated that they would have considered withdrawing their business from Curtis Lumber if the rebates were not paid.[18] The coercive pressures on Curtis Lumber are further evidenced by the email it sent to LP through counsel in July 2007 demanding the rebates be paid.[19] Drawing all reasonable inferences in favor of Curtis Lumber, there is at minimum a factual dispute as to whether Curtis Lumber's decision to pay rebates was compelled by a threat of losing

---

[18]LP argues that we should not consider these statements at the summary-judgment stage because they are inadmissable hearsay. See Fed. R. Civ. P. 56(e)(1). However, the customers' statements are offered to show the effect of the out-of-court statements on the listener (Curtis Lumber) and thus, they are not hearsay. See United States v. Cline, 570 F.2d 731, 734 (8th Cir. 1978) (statements are non-hearsay when used to show the listener's state of mind); United States v. Herrera, 600 F.2d 502, 504 (5th Cir. 1979) (statements are non-hearsay when used to show listener's duress).

[19] See Wermers Floorcovering, Inc. v. Santanna Natural Gas Corp., 794 N.E.2d 1012, 1014 (Ill. App. Ct. 2003) ("Protest may also serve as evidence of compulsion and an unwillingness to pay . . . ."); see also 70 C.J.S. Payment § 119 (same); Richard A. Lord, 28 Williston on Contracts § 71:18 (4th ed.) (same).

substantial business. The question, then, is whether this type of pressure was enough to render payment involuntary under the doctrine of duress.

LP first argues that the pressure from customers is irrelevant because Curtis Lumber can only assert the duress exception against the party who exerted pressure over it. In other words, Curtis Lumber cannot complain about pressure from the customers and allege duress against a third party (e.g., LP). Admittedly, this rule finds some support in a 113-year old Arkansas case:

> The doctrine established by the authorities is that a payment is not to be regarded as compulsory, unless made to emancipate the person or property from an actual and existing duress *imposed upon it by the party to whom the money is paid. . . .* It is sufficient . . . when there is some actual or threatened exercise of power possessed, or believed to be possessed, *by the party exacting or receiving the payment* over the person or property of another from which the latter has no other means of immediate relief than by making the payment.

Vick v. Shinn, 4 S.W. 60, 61 (Ark. 1887) (emphasis removed and added; quotations and internal citations omitted). However, the emphasized language from Vick was dicta because the issue on appeal in that case was the sufficiency of evidence to show duress. The court found that the payment was voluntary, and it did not decide whether duress can be asserted against a person different from the payee exerting pressure. Id.

In Bishop v. Bishop, 250 S.W.3d 570 (Ark. Ct. App. 2007), a modern Arkansas court bypassed a clear opportunity to embrace the rigid rule that LP now proposes. In Bishop, the plaintiff sought reimbursement from his ex-wife for payments that he made to a car dealership on his ex-wife's car, and the ex-wife claimed the payments were voluntary. Id. at 572–73. The plaintiff alleged duress because he made payments to protect his credit rating—i.e., that he was under pressure from third-party creditors. Id. at 573. Bishop ultimately held that the plaintiff's payments made prior to seeking legal relief were voluntary, but payments made afterward were involuntary

because they were made under protest.  Id.  Although the court quoted Vick's limited formulation of duress, it did not adopt the rule that duress can only be asserted against the person exerting pressure.   Id.

Furthermore, we are not aware of any case in which a court has *held* that duress cannot be asserted against a non-payee.  Duress is often asserted against payees, but it does not necessarilly follow that duress is limited to that scenario.  The duress exception, in essence, recognizes that payments made under compulsion are not voluntary.  We believe it makes little difference who exerts pressure and who receives the payment, so long as the duress is causally tied to the defendant and the pressure is sufficient to reasonably deem a payment involuntary.[20]  Any limitation on this doctrine based on the identity of the party exerting pressure would be artificial.  In sum, we believe the duress exception is flexible.  See BMG Direct Mktg. Inc. v. Peake, 178 S.W.3d 763, 776 (Tex. 2005) ("[T]he voluntary-payment rule is an equitable one and may require balancing competing interests depending upon the parties' circumstances.").

Next, LP argues that the evidence is insufficient to show duress because Curtis Lumber "had the absolute right" to deny the customers' requests for payment.  Surely, duress is limited to situations in which the payor had *"no other means of immediate relief* than by making the payment."  Vick, 4 S.W. at 61.  The problem with LP's

---

[20]We stress that our reasoning does not obviate the basic element of causation—Curtis Lumber must still prove that LP' acts *caused* it to pay rebates to seventeen customers.  We agree with LP that an "unrelated third party" should not be held liable for the acts of a payee who exerts pressure on a payor.  See W.R. Grimshaw Co. v. Nevil C. Withrow Co., 248 F.2d 896, 904 (8th Cir. 1957) ("The assertion of duress must be proven by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities.").  But LP is not an "unrelated third party." Viewing the record as we must, LP created a situation in which it was likely that customers would demand satisfaction from Curtis Lumber.  In these circumstances, a reasonable jury could find LP's acts caused Curtis Lumber's dilemma and thereby caused Curtis Lumber to pay the rebates.

argument, though, is that Curtis Lumber's alternative options, in reality, would not have afforded relief. See 25 Am. Jur. 2d Duress & Undue Influence § 24 ("[T]he adequacy of the remedy is to be tested by a practical standard, which takes into consideration the exigencies of the situation of the alleged victim."). Curtis Lumber presented this promotion to its customers, and the customers who ordered SmartSide products represented a substantial portion of Curtis Lumber's overall business. To put it coloquially, it would have been penny wise but pound foolish for Curtis Lumber to demand payment from the customers and to refuse to pay rebates. That is, Curtis Lumber would have fared well in the short-term with the SmartSide promotion but suffered severe repercussions in its overall revenue. As such, a reasonable fact-finder could find that Curtis Lumber had no other means of immediate relief.

Finally, LP contends that Curtis Lumber is actually alleging "business duress" (also referred to as "economic duress" or "business compulsion"), which Arkansas courts have not recognized. Curtis Lumber responds that the modern trend in a wide variety of jurisdictions is to relax the voluntary payment rule to recognize that duress can exist from business pressures just as much as threats of physical harm. See, e.g., Machinery Hauling, Inc. v. Steel of W. Va., 384 S.E.2d 139, 142 (W. Va. 1989) (collecting authorities and summarizing: "Through the years, there has been a steady expansion of duress principle such that direct dire harm is no longer essential, the focus instead being on whether the threat overbears the exercise of free will.").

Neither party cites Cox v. McLaughlin, 867 S.W.2d 460 (Ark. 1993), which we find informative as to how the Arkansas Supreme Court would apply the duress exception in the context of the voluntary payment rule. In that case, a cargo transportation broker arranged for a trucking company to deliver a shipment of pet food from a factory in Nebraska to a warehouse in Texas. Id. at 461. The trucking company leased a truck and agreed to pay a driver to haul the shipment. Id. While the shipment was en route, however, the trucking company told the driver that it could not pay for the delivery. Id. The driver refused to continue on the trip unless paid. Id. The broker, who did not want to lose its valuable brokerage account with the pet

-30-

food company, agreed to pay the driver roughly the amount owed by the trucking company. Id. at 462. The broker later refused to pay the full amount, and the driver sued for breach of contract. Id. The broker sought to void the agreement with the driver on the basis of duress—even though there was no express threat from the pet food company, let alone a threat of physical harm. The Arkansas Supreme Court expressly recognized "[e]conomic duress . . . as a valid excuse for voiding a contract." Id. at 463. Ultimately, the court held that questions of fact precluded summary judgment on the duress issue, e.g., whether the broker would have suffered "serious financial hardship," whether the broker was "the victim of a wrongful act," and whether "other remedies would be inadequate." Id. at 464. Although Cox dealt with a party seeking to void a contract, we believe its analysis is instructive for duress in general.[21] In light of Cox and the persuasive circumstances of this case, we believe the Arkansas Supreme Court would hold that duress may have existed in this case. Thus, summary judgment was inappropriate to the extent it limited damages based on the voluntary payment rule.

### (3) Punitive Damages

By statute in Arkansas, punitive damages are restricted to situations where:

(1) The defendant knew or ought to have known, in light of the surrounding circumstances, that his or her conduct would naturally and probably result in injury or damage and that he or she continued the conduct with malice or in reckless disregard of the consequences, from which malice may be inferred; or (2) The defendant intentionally pursued a course of conduct for the purpose of causing injury or damage.

---

[21]Cox is also persuasive authority against LP's argument that duress exists only where pressure is exerted by the payee. In Cox, the economic pressure originated from the third-party pet food company, but the payee was the trucker. By remanding the case for trial, the Arkansas Supreme Court implicitly held that duress can exist where a third party exerts pressure.

-31-

Ark. Code § 16-55-206. Moreover, plaintiffs are required to satisfy the above standard by clear and convincing evidence. Id. § 16-55-207.

Curtis Lumber argues that punitive damages are particularly appropriate in cases involving fraud. That is true, see Ray Dodge, Inc. v. Moore, 479 S.W.2d 518, 524 (Ark. 1972), but Curtis Lumber's claims based on intentional deception fail as a matter of law. Upon careful review of the record, we believe no reasonable jury could find that LP acted with malice or an intent to harm Curtis Lumber. As such, Curtis Lumber is not entitled to pursue punitive damages.

## III.   Conclusion

For the foregoing reasons, we affirm the district court's judgment with regard to Curtis Lumber's claims for fraud, constructive fraud, and knowing/intentional deceptive trade practices. We reverse the judgment with regard to the claims under Arkansas Code §§ 4-88-107(a)(10) and 4-88-108(2) and promissory estoppel. As to damages, we affirm the district court's limitation on punitive damages but reverse the limitation based on the voluntary payment rule. We remand for further proceedings consistent with this opinion.

SMITH, Circuit Judge, concurring in part and dissenting in part.

I respectfully dissent because I conclude that, applying Arkansas substantive law with respect to all of Curtis Lumber's claims, Curtis Lumber is not the real party in interest to prosecute the present action.

> [Federal Rule of Civil Procedure] Rule 17(a) provides: "[e]very action shall be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a). *The real party in interest is a party who, under governing substantive law, possesses the rights to be enforced. See Iowa Public Serv. Co. v. Medicine Bow Coal Co.*, 556 F.2d 400, 404 (8th Cir. 1977).

"In a diversity action, *state law determines* the issue of who is a real party in interest." *Jaramillo v. Burkhart*, 999 F.2d 1241, 1246 (8th Cir. 1993).

*Consul Gen. of Republic of Indonesia v. Bill's Rentals, Inc.*, 330 F.3d 1041, 1045 (8th Cir. 2003) (emphasis added). "Such a requirement is in place 'to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata.'" *United HealthCare*, 88 F.3d at 569 (quoting Fed. R. Civ. P. 17(a) Advisory Committee Note).

Here, Arkansas law governs who "possesses the rights to be enforced." *Consul Gen.*, 330 F.3d at 1045. Curtis Lumber has brought claims under Arkansas law for violation of the ADTPA, negligent misrepresentation/constructive fraud, equitable estoppel, and intentional misrepresentation/fraud. Therefore, we must look to Arkansas's "substantive law" to determine whether Curtis Lumber is the proper party to bring these claims.

With regard to the ADTPA, Arkansas law provides that "[a]ny person who suffers *actual damage or injury* as a result of an offense or violation as defined in this chapter has a *cause of action* to recover *actual damages*, if appropriate, and reasonable attorney's fees." Ark. Code Ann. § 4-88-113(f) (emphasis added). Similarly, Arkansas law provides that in order for a plaintiff to recover for fraud, "a plaintiff must show," among other things, "*damage suffered* as a result of the reliance [upon the false representation of material fact]." *McAdams v. Ellington*, 970 S.W.2d 203, 205 (Ark. 1998) (emphasis added). The same is true for constructive fraud, *see Knight v. Day*, 36 S.W.3d 300, 302 (Ark. 2001), and promissory estoppel, *see Shaw v. Smith*, No. CA 87-393, 1988 WL 42674, at *2 (Ark. Ct. App. May 4, 1988) (unpublished).

As the majority notes, Curtis Lumber alleges that it has sustained actual damages for lost profits and rebates that it paid to its customers. *See supra* Part II.D.1–2. The question of whether Curtis Lumber has sustained actual damages under

Arkansas substantive law and, in turn, is the proper party in interest to bring the present suit, turns on whether Arkansas's voluntary payment rule applies to its claims for damages.

Originally, the district court found that Curtis Lumber could not recover the rebates or refunds that it paid to its customers because those payments were "voluntary," and Curtis Lumber was under no legal obligation to make those payments. The court also found that the "economic duress" exception to the voluntary payment rule did not apply because that rule would only apply if LP had exerted economic duress over Curtis Lumber to force Curtis Lumber to pay the rebates to LP—not the customers. But the court found that Curtis Lumber had provided enough evidence of lost profits and increased costs to withstand LP's summary judgment motion on the issue of actual damages.

Thereafter, LP filed a motion for reconsideration, arguing that any Curtis Lumber damage must be "separate and independent from a claim of a rebate applicant, which would only be the $2,400 if they ever sued LP." LP asserted that

> the lost profit that they [Curtis Lumber] would seek in this case could only be a part of a $2,400 rebate claim, because that is the amount of money that Mr. Curtis built into his sales price when he sold the SmartSide products. And, thus, if he were to sue us for a lost profit—and he's already told us on the average the lost profit per customer who bought $2,400 of material was $600. If he sues us for that and the Court lets him do that and then a customer later sues LP for its rebate of $2,400, we ultimately pay a $3,000 amount on a $2,400 rebate.
>
> So [L.P.'s] position is that the lost profit could only be a part of the rebate claim of the claimant and he has no right to recover that, because it's not separate and distinct.

LP then asserted that no exception to the voluntary payment rule applied.

Curtis Lumber also confirmed for the district court that it had initially charged the accounts of customers who had not made a payment on their account; when the customers then informed Curtis Lumber that they did not want the product, Curtis Lumber then "wrote off the account or credited the account for the amount that had been originally billed under an invoice." Curtis Lumber did not consider this to be a "voluntary payment" because it had not paid the customers anything; furthermore, the customers did not receive the product, nor had they ever paid Curtis Lumber.

But the district court found that this was a "distinction without a difference," explaining:

> If they paid you money and you refund them money to erase a debt, then if they have been charged and then you forgive that charge by writing off the account, the bottom line is the same. All of the money has been refunded to the customer either in the form of cash if they advanced cash or credit if they have just been charged on an account. It seems to me that . . . under these circumstances, if it's undisputed that all of the customers were either refunded cash for what they were advanced or given credit to cancel their account, that they all fall under this voluntary payments rule and would not be included as damages.

In its order granting LP's motion for reconsideration, the district court found that "the voluntary payment rule precludes the Plaintiff from recovering lost profits based upon the facts of this case."

On appeal, Curtis Lumber argues that the district court erred in holding that the voluntary payment rule barred its recovery because its "cancelation [sic] of orders and payment of refunds and rebates to its customers were not 'voluntary' in either the common-sense or legal meaning of the word" because its "actions and damages . . . were the result of L[.]P[.]'s *fraud and duress* placed on Curtis Lumber." (Emphasis added.)

"It has long been settled that money voluntarily paid in satisfaction of an unjust or illegal demand, with full knowledge of the facts, and without fraud, duress, or extortion, cannot afterwards be recovered by the payor." *Larrimer v. Murphy*, 82 S.W. 168, 169 (Ark. 1904).[22] "In order for the voluntary-payment rule to apply*,* [the payor] must not have had [a legal] duty [to pay]." *TB of Blytheville*, 946 S.W. 2d at 933.

Under Arkansas law, "the making of the advancements and the placing of the credits to [an] account" is a "payment." *Ritchie*, 110 S.W. at 592.

> Where there is an open account between two parties, in the absence of an agreement to the contrary, all items of the account become constituent parts thereof, and are applied in payment of the oldest item in the account on the other side; and he only is entitled to recover in whose favor the final balance upon the whole account is found. The rule is, where there are mutual accounts, the credits on one side are applied, to the extinguishment of debits on the other, as payments intentionally made thereon.

*Id*.

As to Curtis Lumber's claim for lost profits, the majority concludes that "[a]lthough Curtis Lumber's payments to customers arguably were 'voluntary,' Curtis Lumber's alleged lost profits were not." *See supra* Part II.D.1. But Curtis Lumber's claim for lost profits stems from it either (1) refunding in total a customer who already paid for the SmartSide products or (2) crediting back the account of a customer who had ordered, but not yet paid for, SmartSide products. Although it may have been areasonable business decision, Curtis Lumber has failed to produce any evidence that it was under a legal obligation to make this refund or credit to its customers. *See TB*

---

[22]As an initial matter, Curtis Lumber's assertion that it paid its customers because of L.P.'s "fraud and duress" is an implicit concession that the voluntary payment rule is applicable because fraud and duress are two *exceptions* to the voluntary payment rule. *See Larrimer*, 82 S.W. at 169.

*of Blytheville*, 946 S.W. 2d at 933. Furthermore, both the refunding of customers and the crediting back of customers' accounts constitute "payments" under Arkansas law, as the district court correctly concluded. *See Ritchie*, 110 S.W. at 592. As a result, the voluntary payment rule is applicable unless Curtis Lumber can show that an exception to the rule applies. *See Larrimer*, 82 S.W. at 169.

As to the rebates that Curtis Lumber paid to some of its customers, the majority notes Curtis Lumber's concession that "it had no enforceable obligation to pay rebates to its customers. Instead, it argues that the fraud and duress exceptions to the voluntary payment rule apply, and therefore, payment of the rebates was not voluntary." *See supra* Part II.D.2.

I concur in the majority's conclusion that the fraud exception does not apply, but I extend its conclusion to both Curtis Lumber's claims for rebates *and* lost profits. *See supra* Part II.D.2. I respectfully dissent from the majority's conclusion that "the Arkansas Supreme Court would hold that duress may have existed in this case." *Id*. Instead, I conclude that the duress exception does not apply to either Curtis Lumber's claim for rebates or lost profits.

First, I disagree with the majority's dismissal of the Arkansas Supreme Court's statement in *Vick*

> that a payment is not to be regarded as compulsory, unless made to emancipate the person or property from an actual and existing duress *imposed upon it by the party to whom the money is paid* . . . . It is sufficient . . . when there is some actual or threatened exercise of power possessed, or believed to be possessed, *by the party exacting or receiving the payment* over the person or property of another from which the latter has no other means of immediate relief than by making the payment.

*Vick*, 4 S.W. at 61 (emphasis removed and added; quotations and internal citations omitted). "Dicta can, of course, have persuasive value." *Pretka v. Kolter City Plaza*

*II, Inc.*, 608 F.3d 744, 762 (11th Cir. 2010). Furthermore, "[i]n the absence of a definitive ruling by the highest state court, a federal court may consider . . . dicta . . . to show how the highest court in the state would decide the issue at hand . . . ." *Michelin Tires (Canada) Ltd. v. First Nat'l Bank*, 666 F.2d 673, 682 (1st Cir. 1981); *see also Kirk v. Hanes Corp. of N. Carolina*, 16 F.3d 705, 709 (6th Cir. 1994) ("But, because even dicta may be of some value in ascertaining the relevant state law, we consider it on that basis.").

In the absence of a definitive ruling by the Arkansas Supreme Court regarding whether duress can be asserted against a non-payee, the language in *Vick* should be our guide as to how the highest court in the state would resolve the present issue. *Vick* explicitly states that the duress imposed upon the plaintiff must be "by the party to whom the money is paid." 4 S.W. at 61. Here, Curtis Lumber paid the money to its customers—not to L.P.

Second, although the majority relies on *Bishop*, in *Bishop*, the Arkansas Court of Appeals stated that the party asserting duress must have "*'no other means of immediate relief* than by making the payment.'" 250 S.W.3d at 573 (quoting *Vick*, 4 S.W. at 61). As previously discussed, Curtis Lumber has presented no evidence that it was under any legal obligation to LP or to its customers to pay the refunds and rebates. Thus, Curtis Lumber was "best able to avoid the loss by not paying" the customers. *See id.*

Finally, the *Cox* case that the majority found "informative as to how the Arkansas Supreme Court would apply the duress exception in the context of the voluntary payment rule," *see supra* Part II.D.2., is distinguishable. In *Cox*, the broker—the payor—sought to recover directly from the payee—the driver—*not* from a third party—the trucking company. 867 S.W. at 462. In contrast, Curtis Lumber—the payor—*is* seeking to recover from a third party—LP—*not* from the payees—the customers.

Accordingly, would apply the Arkansas voluntary payment rule and find that Curtis Lumber has not sustained actual damages under Arkansas substantive law. Consequently, I would hold that Curtis Lumber is *not* the proper party in interest to bring the present suit.

Therefore, I would affirm the judgment of the district court.

_____